No. 25-3312

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

THE ASSOCIATED PRESS; THE MCCLATCHY COMPANY, LLC, DBA
THE IDAHO STATESMAN; EAST-IDAHO-NEWS.COM, LLC, DBA
EAST IDAHO NEWS,

*Plaintiffs-Appellees*,

v.

BREE DERRICK, IN HER OFFICIAL CAPACITY AS DIRECTOR OF THE
IDAHO DEPARTMENT OF CORRECTION,

*Defendant-Appellant.*

On Appeal from the United States District Court for the District of
Idaho Case Number 1:24-cv-00587, Hon. Debora K. Grasham

**APPELLANT'S OPENING BRIEF**

RAÚL LABRADOR
Attorney General of Idaho

Karin Magnelli, ISBN 6929
Lead Deputy Attorney General
Kristina M. Schindele, ISBN 6090
Deputy Attorney General
Idaho Department of Correction
1299 North Orchard St., Suite 110
Boise, Idaho 83706

Michael J. Elia, ISBN 5044
Special Deputy Attorney General
Tanner J. Smith, ISBN 12245
Moore Elia Kraft & Stacey, LLP
Post Office Box 6756
Boise, Idaho 83707

*Attorneys for Appellant*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................ iii

INTRODUCTION ............................................................................... 1

JURISDICTIONAL STATEMENT ..................................................... 2

STATEMENT OF ADDENDUM ......................................................... 3

ISSUES PRESENTED ........................................................................ 3

STATEMENT OF THE CASE ............................................................ 4

    I.  Plaintiffs' claim. ..................................................................... 4

    II. Explanation of IDOC's execution procedures. ................... 4

    III.   Procedural history. ........................................................... 8

SUMMARY OF THE ARGUMENT .................................................... 9

STANDARD OF REVIEW ................................................................ 13

ARGUMENT ..................................................................................... 14

    I.  There is not a constitutional right to access the Medical Team in the Medical Team Room. ............................................ 14

        A. Ninth Circuit caselaw does not provide a right to access the Medical Team in the Medical Team Room. ............................... 15

        B. *Woodford* already stands on questionable footing, the district court abused its discretion by extending it further. ................. 23

        C. Even if *Woodford* could be extended, neither history nor logic support a right to access the Medical Team in the Medical Team Room. ........................................................ 30

i

1. There is not a history of accessing people like the Medical Team in places like the Medical Team Room. ...................... 31

a. Historical events establish that there is no right to access executions, much less personnel in separate rooms. ....... 40

2. No functional importance is served by accessing the Medical Team in the Medical Team Room. ........................................ 46

II. Even if the Constitution requires access, IDOC's processes satisfy unitary deferential review. ........................................... 53

III. The PLRA bars Plaintiffs from success on the merits. ............. 65

IV. Plaintiffs are not irreparably harmed absent preliminary relief. 69

V. The balance of equities and public interest weigh against preliminary relief. ....................................................... 69

VI. The district court's injunction is vague and overly broad. ....... 71

CONCLUSION ....................................................... 74

STATEMENT OF RELATED CASES

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Amatel v. Reno,*
    156 F.3d 192 (9th Cir. 1998) ....................................................... 63

*Ark. Times, Inc. v. Norris,*
    No. 5:07-cv-00195 SWW, 2008 WL 110853
    (E.D. Ark. Jan. 7, 2008) ............................................ 28, 46, 49

*Ashelman v. Wawrzaszek,*
    111 F.3d 674 (9th Cir. 1997) ....................................................... 54

*Assoc. Gen. Contractors of Cal., v. Coal. for Econ. Equity,*
    950 F.2d 1401 (9th Cir. 1991) ..................................................... 69

*Assoc. Press v. Otter,*
    682 F.3d 821 (9th Cir. 2012) ...................................... 20, 39, 41, 59

*Associated Press v. Neal,*
    1:25-cv-00872-MPD-MJD, 2025 WL 1692469 (S.D. Ind. May 16,
    2025), *appeal pending,* No. 25-2025 (7th Cir.) .............................. 30

*Atonio v. Wards Cove Packing Co.,*
    810 F.2d 1477 (9th Cir. 1987) ..................................................... 27

*BH Media Grp., Inc. v. Clarke,* 466 F. Supp. 3d 653, 659–65 (E.D. Va.
    2020), *vacated and remanded,*
    851 F. App'x 368 (4th Cir. 2021) ........................................... 29, 70

*Branzburg v. Hayes,*
    408 U.S. 665 (1972) ................................................................... 15

*Cal. First Amend. Coal. v. Woodford,*
    299 F.3d 868 (9th Cir. 2002) ...16, 17, 18, 23, 25, 27, 28, 29, 30, 32,
    34, 35, 47, 48, 52, 53

*Cal. First Amend. Coalition v. Calderon,*
    150 F.3d 976 (9th Cir. 1998) ..........15, 16, 19, 21, 25, 27, 30, 48, 70

*Calderon v. Thompson,*
    523 U.S. 538 (1998) ............................................................. 58, 70

iii

*Caribbean Marine Servs. Co. v. Baldrige,*
    844 F.2d 668 (9th Cir. 1988) ........................................ 69

*Cleburne v. Cleburne Living Ctr.,*
    473 U.S. 432 (1985) ..................................................... 56

*Columbia Pictures Indus. v. Fung,*
    710 F.3d 1020 (9th Cir. 2013) ...................................... 71

*Creech v. Tewalt* ("*Creech I*"),
    84 F.4th 777 (9th Cir. 2023)........................... 19, 31, 68

*Creech v. Tewalt* ("*Creech II*"),
    94 F.4th 859 (9th Cir. 2024),
    *cert. denied*, 144 S. Ct. 1027 (2024)............................ 36

*Doe v. Harris,*
    772 F.3d 563 (9th Cir. 2014) ....................................... 69

*Evans v. Skolnik,*
    997 F.3d 1060 (9th Cir. 2021) ..................................... 55

*F.C.C. v. Beach Commc'ns, Inc.,*
    508 U.S. 307 (1993) ..................................................... 56

*First Amend. Coal. of Ariz. v. Ryan* ("*FACA*"),
    938 F.3d 1069 (9th Cir. 2019) .................. 18, 19, 21, 29, 34, 35, 36

*Frazier v. Hamm,*
    No. 2:24-cv-732-ECM [WO], 2025 WL 361172 (M.D. Ala. Jan. 31,
    2025) ............................................................................ 57

*Freeman v. Tex. Dept. of Crim. J.,*
    369 F.3d 854 (5th Cir. 2004) ....................................... 57

*Galvez v. Jaddou,*
    52 F.4th 821 (9th Cir. 2022).......................................... 14

*Gilmore v. California,*
    220 F.3d 987 (9th Cir. 2000) ....................................... 65

*Gregg v. Georgia,*
    428 U.S. 153 (1976) ..................................................... 47

*Guardian News & Media LLC v. Ryan,*
    225 F. Supp. 3d 859 (D. Ariz. 2016) ....................... 21, 22

iv

*Hill v. McDonough,*
    547 U.S. 573 (2006) .................................................................. 69

*Holden v. Minnesota,*
    137 U.S. 483 (1890) ......................................................... 25, 43

*Houchins v. KQED, Inc.,*
    438 U.S. 1 (1978) ................................................. 14, 15, 25, 26, 51

*Hrdlicka v. Reniff,*
    656 F.3d 942 (9th Cir. 2011) ......................................................... 54

*Jones v. Slade,*
    23 F.4th 1124 (9th Cir. 2022) ................................................ 54, 55, 58

*KQED, Inc. v. Houchins* ("*KQED*"),
    546 F.2d 284 (9th Cir. 1976), *rev'd*, 438 U.S. 1 (1978) ................. 26

*L.A. Times Commun., LLC v. Kernan,*
    No. 18-cv-02146-RS,
    2018 WL 10419787 (N.D. Cal. Aug. 17, 2018) ................. 21, 22, 23

*LA All. for Hum. Rts. v. Los Angeles,*
    14 F.4th 947 (9th Cir. 2021) .................................................. 14, 39

*Lair v. Bullock,*
    798 F.3d 736 (9th Cir. 2015) ................................................. 16, 27

*Lopez v. Brewer,*
    680 F.3d 1068 (9th Cir. 2012) .............................................. 13, 32

*Lumumba v. Kiser,*
    116 F.4th 269 (4th Cir. 2024),
    *cert. denied*, 145 S. Ct. 1189 (2025)........................................... 54

*Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.,*
    571 F.3d 873 (9th Cir. 2009) ......................................................... 14

*Mauro v. Arpaio,*
    188 F.3d 1054 (9th Cir. 1999) ............................... 56, 58, 60, 61, 62

*McBurney v. Young,*
    569 U.S. 221 (2013) .......................................................... 15, 52

*McGehee v. Tex. Dept. of Crim. J.,*
    No. MC H-18-1546,
    2018 WL 3996956 (S.D. Tex. Aug. 21, 2018) ................................ 60

*Merrifeld v. Lockyer*,
   547 F.3d 978 (9th Cir. 2008) ....................................................56

*Meyer v. Portfolio Recovery Assocs., LLC*,
   707 F.3d 1036 (9th Cir. 2012) ...................................................14

*Minnesota v. Pioneer Press Co.*,
   110 N.W. 867 (Minn. 1907) ......................................................45

*Morrison v. Hall*,
   261 F.3d 896 (9th Cir. 2001) ....................................................61

*Nixon v. Warner Commun., Inc.*,
   435 U.S. 589 (1978) ................................................................51

*Norbert v. San Francisco*,
   10 F.4th 918 (9th Cir. 2021) ....................................................14

*O'Lone v. Estate of Shabazz*,
   482 U.S. 342 (1987) ................................................................62

*Okla. Observer v. Patton*,
   73 F. Supp. 3d 1318 (W.D. Okla. 2014) ... 11, 28, 29, 34, 35, 36, 40,
   45, 46, 50

*Overton v. Bazzetta*,
   539 U.S. 126 (2003) ................................................................54

*Owens v. Hill*,
   758 S.E.2d 794 (Ga. 2014) ......................................................34

*Pell v. Procunier*,
   417 U.S. 817 (1974) ................................................15, 24, 29, 54

*PG Pub. Co. v. Aichele*,
   705 F.3d 91 (3d Cir. 2013) .......................................................47

*Pizzuto v. Tewalt*,
   997 F.3d 893 (9th Cir. 2021) ................................................19, 36

*Press-Enter. Co. v. Superior Court* ("*Press-Enter. I*"),
   464 U.S. 501 (1984) ............................................................24, 29

*Press-Enter. Co. v. Superior Court* ("*Press-Enter. II*"),
   478 U.S. 1 (1986) .....................................24, 29, 30, 31, 32, 46, 52

*Prison Legal News v. Ryan*,
   39 F.4th 1121 (9th Cir. 2022)................................................56, 64

vi

*Radio and TV News Ass'n of S. Cal. v. U.S. Dist. Ct.*,
    781 F.2d 1443 (9th Cir. 1986) ...................................... 51

*Raidoo v. Moylan*,
    75 F.4th 1115 (9th Cir. 2023) ...................................... 55

*Richmond Newspapers v. Virginia*'s,
    448 U.S. 555 (1980) ............. 23, 24, 25, 26, 29, 30, 31, 32, 35, 46, 68

*Schad v. Brewer*,
    No. CV-13-2001-PHX-ROS,
    2013 WL 5551668 (D. Ariz. Oct. 7, 2013) ................................ 35, 36

*Schmidt v. Lessard*,
    414 U.S. 473 (1974) ...................................... 71

*Shaw v. Murphy*,
    532 U.S. 223 (2001) ...................................... 55

*State Rifle & Pistol Ass'n v. Bruen*,
    597 U.S. 1 (2022) ...................................... 24, 32, 33, 39

*Stevens v. Mich. Ct.*,
    No. 21-1727, 2022 WL 3500193 (6th Cir. Aug. 18, 2022) ............. 33

*Stormans, Inc. v. Selecky*,
    586 F.3d 1109 (9th Cir. 2009) ...................................... 73

*Tanzin v. Tanvir*,
    592 U.S. 43 (2020) ...................................... 67

*Thornurgh v. Abbott*,
    490 U.S. 401 (1989) ...................................... 61, 62, 64

*Turner v. Safley*,
    482 U.S. 78 (1987) ................................... 53, 55, 57, 61, 62, 63, 64

*U.S. v. Sineneng-Smith*,
    590 U.S. 371 (2020) ...................................... 33

*U.S. v. Vongxay*,
    594 F.3d 1111 (9th Cir. 2010) ...................................... 24

*Union Home Mortg. Corp. v. Cromer*,
    31 F.4th 356 (6th Cir. 2022) ...................................... 72

*Walker v. Beard*,
    789 F.3d 1125 (9th Cir. 2015) ...................................... 57

vii

*Winter v. Nat. Res. Def. Council, Inc.*,
 555 U.S. 7 (2008) ........................................................ 13

*Workman v. Bredesen*,
 486 F.3d 896 (6th Cir. 2007) ...................................... 58

**Statutes**

18 U.S.C. § 3626 ................................................ 65, 66, 67, 68

1830 Conn. Laws, 284 ............................................... 43

1833 R.I. Laws, 50–51 .............................................. 43

1833–34 Pa. Laws, 234–35 ......................................... 43

1834 N.J. Laws 170 ................................................. 43

1835 N.H. Laws, 241–42 ........................................... 43

1835 N.Y. Laws 299 ................................................ 43

1839 Miss. Laws, 110 ............................................... 43

1843 Ohio Laws, 71 ................................................. 43

1849 Del. Laws, 366–67 ............................................ 43

1852 Ind. Acts, vol. II, 379 ........................................ 43

1858 Kan. Terr. Laws, 190 ......................................... 43

1859 Colo. Terr. Laws, 57 ......................................... 44

1859 Ga. Laws, 62–63 .............................................. 44

1859 Ill. Laws, 17 § 1 .............................................. 44

1864 Mont. Terr. Laws, 250 ....................................... 44

1874 Or. Laws, 115–116 ........................................... 44

1875 Nev. Stat., 53 ................................................. 44

1876 Wyo. Terr. Laws, 161 ........................................ 44

1882 Md. Laws, 630–31 ............................................ 44

1883 Tenn. 139–40 ................................................. 44

1884 La. Laws, 102 ...................................................................... 44

1887 Mo, Laws, 169 ..................................................................... 44

1888 N.Y. Laws, 780 .................................................................... 45

1889 Colo. Laws, 118 ................................................................... 44

1889 Colo. Laws, 119 ................................................................... 45

1889 Minn. Laws, 66 ................................................................... 44

1889 Minn. Laws, 66–67 ............................................................. 45

1891 Cal. Laws, 274 .................................................................... 44

1893 Ga. Laws, 41–42 ................................................................ 44

1901 Neb. Laws, 506 .................................................................. 44

1901 Wash. Laws, 101 ................................................................ 44

1903 N.M. Laws, 141 .................................................................. 44

1908 Va. Laws, 685 .................................................................... 45

1908 Va. Laws, 686 .................................................................... 45

1909 Ariz. Terr. Laws, 96–97 ...................................................... 44

1909 Wash. Laws, 952 ................................................................ 45

1913 Ark. Laws, 174 ................................................................... 45

28 U.S.C. § 1292 .......................................................................... 3

28 U.S.C. § 1331 .......................................................................... 2

28 U.S.C. § 1343 .......................................................................... 2

28 U.S.C. § 1915 ........................................................................ 66

28 U.S.C. § 1915A ...................................................................... 66

42 U.S.C. § 1997e ....................................................................... 66

Idaho Code § 19-2704 ................................................................ 25

Idaho Code § 19-2716A .............................................................. 59

Idaho Rev. St. § 8021 (1887) ...................................................... 40

Idaho Rev. St. §§ 8005–21 (1899) .............................................. 41

Mont. Code § 46-19-103 ............................................................ 59

Neb. Rev. Stat. § 83-967 ............................................................ 59

Ohio Rev. Code § 2949.221 ........................................................ 59

Okla. Stat. tit. 22, § 1015 .......................................................... 59

S.C. Code § 24-3-580 ................................................................. 59

## Other Authorities

Betsy Russell, *News media have witnessed all but one Idaho state execution since 1901*, THE SPOKESMAN-REVIEW (June 4, 2012) ..... 39

Harry Barnes, *Historical Origin of the Prison System in America*, 12 J. Am. Inst. Crim. L. & Criminology 35 (1921) ................. 26, 27

J. of the 34th Hous. of Rep. of the Commw. of Pa, (1823–24) ............... 43

Kathy Deinhardt Hill, *Hanged – A History of Idaho's Executions* ("*Hanged*") (2010) ................................................. 36, 37, 38, 40, 42

Mary D. Fan, *The Supply-Side Attack on Lethal Injection and the Rise of Execution Secrecy* ("*Supply-Side Attack*"), 95 B.U. L. Rev. 427 (2015) .............................................. 33, 50, 58

Statement of Purpose, Hous. B. 633, 66th Leg., 2d Reg. Sess. (Idaho 2022) ........................................... 59

## Rules

Fed. R. Civ. P. 65 ...................................................................... 71

## INTRODUCTION

This case turns on a line—whether it exists, where it lies, and who draws it. This case presents a novel question: Does the First Amendment provide a right for the media to see and hear execution personnel in a secure room that the condemned person never enters? The answer is no.

Plaintiffs are three media organizations who sued the Idaho Department of Correction's ("IDOC") Director, claiming a First Amendment right to see and hear what happens in the Medical Team Room before, during, and after an execution. The Medical Team Room is located inside the building where IDOC carries out executions. Condemned prisoners never enter this room. The district court entered a mandatory preliminary injunction, enjoining IDOC from carrying out any execution unless it provides witnesses to the execution audio and visual access to "those medical team members that perform *all tasks associated* with the preparation and administration of lethal injection drugs in the Medical Team Room." (1-ER-34 (italics added)). No court has ever mandated such unprecedented access. Not the Supreme Court. Not this Court. Not any court.

1

The First Amendment does not provide a right to access the Medical Team in the Medical Team Room. This Court has said that whatever access the First Amendment might provide, it is "severely limited." At most, the press is afforded the ability to see and hear condemned persons be executed—not the actors involved, or every room used in the process.

IDOC's policies provide this access by letting witnesses see and hear the condemned during an execution. But even if the First Amendment mandated more access, IDOC's policy is constitutional because it is reasonably related to legitimate interests like protecting the identities of the Medical Team and upholding statutory duties. The district court's preliminary injunction stretches precedent beyond recognition and upends settled principles of deference to prison administrators.

The district court abused its discretion by entering the preliminary injunction. Defendant respectfully requests that this Court reverse.

## JURISDICTIONAL STATEMENT

The U.S. District Court for the District of Idaho had subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1343. The district court's preliminary injunction was entered April 29, 2025. (1-ER-2). Defendant

2

appealed on May 21, 2025. (3-ER-430). This Court has jurisdiction under 28 U.S.C. § 1292(a)(1).

## STATEMENT OF ADDENDUM

The full text of the pertinent regulatory and statutory authorities are included in this brief's Addendum.

## ISSUES PRESENTED

1.     Did the district court err by holding that the press has a First Amendment right to access the Medical Team in the Medical Team Room where Ninth Circuit precedent does not provide such access, and there is no historical basis or logical reason for such access?

2.     Does the injunction improperly disregard IDOC's legitimate interests?

3.     Does the Prison Litigation Reform Act's needs-narrowness-intrusiveness test bar the district court's preliminary injunction?

4.     Does Plaintiffs' speculative claim constitute irreparable harm?

5.     Does the public's interest in carrying out lawful sentences warrant reversal?

6.    Is the district court's preliminary injunction overbroad and vague in violation of Rule 65?

## STATEMENT OF THE CASE

### I.    Plaintiffs' claim.

Plaintiffs are three media organizations. Plaintiffs sued for audio and visual access to the Medical Team Room "leading up to, during, and immediately after any future executions." (3-ER-345).

### II.    Explanation of IDOC's execution procedures.

Idaho executions occur in F Block at the Idaho Maximum Security Institution ("IMSI"). F Block has various rooms, including two witness areas, an Execution Chamber, a Preparation Room, and a Medical Team Room. (Add-0014). The Medical Team Room is separate from the Execution Chamber, and the condemned person never enters it. (Add-0040–41). A solid wall with two pass-through holes for IV lines separates the rooms. (1-ER-3).

The Medical Team routinely trains and rehearses executions. (Add-0009). At least ten trainings are scheduled per year. (*Id*.). Weekly trainings are conducted when there is a pending death warrant. (*Id*.).

4

Before an execution, the Medical Team engages in preparatory acts within the Medical Team Room. (Add-0036). These preparations can occur hours before an execution. (*Id*.).

On the day of an execution, the Warden transfers custody of the execution chemical to the Medical Team Leader. (*Id*.). This can occur hours before an execution. (*Id*.).

Once the Medical Team has the chemical, the Medical Team prepares syringes for primary set A, backup set B, and backup set C.[1] (*Id*.). This can be done hours before an execution. (*Id*.).

The Medical Team applies labels to the syringes to identify the chemical in each. (*Id*.). This can be completed hours before an execution. (*Id*.). The labels can be prepared anytime beforehand. (*Id*.).

After the syringes are prepared and labeled, the Medical Team Leader places the three complete sets of syringes in color-coded, labeled trays. (*Id*.). This can be done hours before the execution. (*Id*.).

-----

[1] This syringe preparation does not include drawing chemical.

5

After the syringes are prepared and in the correct trays, the Medical Team Leader confirms that they are properly labeled and placed in proper trays. (*Id.*). This can be completed hours before an execution. (*Id.*).

Witnesses are escorted to the witness areas shortly before an execution is scheduled to begin. (Add-0040). Executions begin when the condemned person enters the Preparation Room. (*Id.*). Witnesses have audio and visual access to the condemned person for the entire execution.

In the Preparation Room, IV catheters are inserted into the condemned person. (*Id.*). After catheters are inserted and EKG leads are affixed to his person, the Escort Team moves the condemned person on the medical gurney to the Execution Chamber. (*Id.*).

Once the medical gurney is secured in the Execution Chamber, the Medical Team Leader attaches the EKG leads to the monitor (which is in the Medical Team Room), and attaches the IV lines to the established catheter sites. (*Id.*). The Medical Team Leader then joins the Medical Team in the Medical Team Room. (Add-0036, 41–43).

Once inside the Medical Team Room, the Medical Team Leader instructs the assigned Medical Team member to draw chemical set A. (Add-

6

0036). The Medical Team Leader then notifies the Warden that the Medical Team is ready to proceed. (*Id.*).

The Warden then reads aloud the death warrant, asks the condemned person if he wishes to make a last statement, and provides an opportunity to do so. (Add-0041).

After confirmation that there is no impediment to proceeding, the Director instructs the Warden to carry out the death sentence. (Add-0042). The Warden then instructs the Medical Team Leader to administer chemicals. (*Id.*).

The Medical Team Leader instructs the assigned Medical Team member to dispense the chemical. (Add-0042–43).

The assigned Medical Team member visually and verbally confirms the chemical name on the syringe and then administers it in accordance with the applicable method. (Add-0042–43). The Medical Team alerts the Warden when it is going to administer chemical with a light system visible to the Warden. (2-ER-224). The Warden, in turn, verbally alerts witnesses that chemical is being administered. (*Id.*). The Medical Team documents all chemical administrations. (Add-0043–44).

Once all electrical activity to the heart ceases, the coroner enters the chamber to examine and pronounce the death. (Add-0043). The Warden announces that the death sentence has been carried out, and the execution is complete. (*Id.*). Witnesses are then escorted out of the witness areas. (*Id.*).

## III.  Procedural history.

When commencing this suit, Plaintiffs moved for a preliminary injunction "prohibiting Defendant from restricting access to the Medical Team Room leading up to, during, or immediately after any future executions of condemned individuals." (2-ER-297–78). Defendant opposed Plaintiffs' motion and moved to dismiss, arguing:

1. Plaintiffs' claim was unripe and concerned political questions;

2. IDOC's processes complied with existing First Amendment precedent;

3. Plaintiffs were not likely to create a new First Amendment right;

4. *Woodford* is irreconcilable with Supreme Court precedent;

5. The PLRA barred Plaintiffs' claim;

6. Plaintiffs were not irreparably harmed absent preliminary relief; and

8

7.  The public's interest weighed against injunctive relief. (2-ER-202–22; 2-ER-228–47).

The district court denied Defendant's motion to dismiss. (2-ER-105). Defendant answered Plaintiffs' Complaint on March 20, 2025. (2-ER-37).

The district court heard argument on Plaintiffs' preliminary injunction motion on April 8, 2025. (3-ER-358–429). The district court granted Plaintiffs' motion, in part, on April 29, 2025, enjoining IDOC from executing anyone unless IDOC provides witnesses audio and visual access to "those medical team members that perform all tasks associated with the preparation and administration of lethal injection drugs in the Medical Team Room." (1-ER-31, 34).

## SUMMARY OF THE ARGUMENT

I.A.   There is not a First Amendment right to access the Medical Team in the Medical Team Room. This Court is the only circuit to find a constitutional right to access executions. But even those cases reiterate that the right is "severely limited" and confined in scope to seeing and hearing the condemned person in the execution place. IDOC provides that access and that access is not in dispute. The district court abused its

9

discretion by overextending Ninth Circuit precedent beyond its express confines.

I.B.   The district court abused its discretion by extending *Woodford*'s principles to a different type of access. *Woodford* stands on questionable footing. Every court outside of this Circuit to address whether there is a right to access executions at prisons has said no. These courts even analyzed, arguendo, the history and logic test relied on by *Woodford* and held that if it applies to executions (which many of those courts cast doubt on), it cannot be satisfied. Further, *Woodford*'s holding is at odds with other binding precedent, i.e., *Calderon*. Because *Woodford* rests on shaky grounds to begin with, the district court abused its discretion by extending it further.

I.C.   Even if *Woodford* was worthy of extension, the experience and logic test does not support the district court's injunction. The district court erroneously placed the burden on Defendant to establish a lack of historical access when Plaintiffs bore the burden of proving historical access. Plaintiffs failed to meet their burden because they did not establish historical access to the particular people, place, and process that they seek access to. Indeed, the only source provided to the district court on

point establishes that executioners were historically hidden. *See Okla. Observer v. Patton*, 73 F. Supp. 3d 1318, 1326 (W.D. Okla. 2014) (explaining how executioner was hidden from witnesses). The district court also conducted its own factual research to overcome Defendant's arguments. This was an abuse of discretion.

The district court also erroneously found logic behind providing access to the Medical Team Room. The district court's analysis was focused on potential Eighth Amendment violations to condemned persons. But the inquiry is supposed to ask whether the requested access furthers the execution process's functioning, which the district court's access does the opposite of. Regardless, the district court's logical concerns related to the Eighth Amendment are accomplished by accessing the condemned person during the execution—which IDOC provides. Neither history nor logic support a constitutional right to access the Medical Team in the Medical Team Room. Finding otherwise constitutes an abuse of discretion.

II.     Even if there is a right, IDOC's processes satisfy unitary, deferential review. The district court misapplied the legal principles underlying this analysis. Rather than placing the burden on Plaintiffs under

*Turner*, the district court again placed the burden on Defendant to prove—with evidence—that IDOC's processes are constitutional. This was erroneous. IDOC did not bear the burden, and Defendant was not required to present evidence. Further, the district court erroneously analyzed the other factors under the lens that IDOC's processes were not rationally related to a legitimate government interest. But that's wrong. IDOC's processes pass constitutional muster.

III. The PLRA's needs-narrowness-intrusiveness test bars Plaintiffs from success on the merits. This test applies here because Plaintiffs' claim concerns "the conditions of confinement or the effects of actions by government officials on the lives of persons confined in prison." The district court's injunction fails under the needs-narrowness-intrusiveness test because it is unduly intrusive, overly broad, and not needed.

IV. The district court erroneously found that Plaintiffs would be irreparably harmed. Plaintiffs failed to present a colorable claim. This Court should reverse.

V. The public's interest and balance of equities outweigh any need for preliminary relief. The state and victims have important interests in the timely enforcement of a sentence. The district court rejected

12

these interests by enjoining Idaho from carrying out any executions. This was an abuse of discretion.

VI.    The district court's injunction is vague and overly broad. The district court enjoined all executions unless witnesses can see and hear "those medical team members that perform *all tasks associated with* the preparation and administration of the lethal injection drugs in the Medical Team Room." This does not provide notice of what exactly is being enjoined. And it is overly broad because it extends to before and after an execution, and to people not directly involved in chemical administration.

## STANDARD OF REVIEW

Preliminary injunctions are "extraordinary and drastic" remedies "that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012). The movant must clearly establish (1) "that he is likely to succeed on the merits," (2) "that he is likely to suffer irreparable harm in the absence of preliminary relief," (3) "that the balance of equities tips in his favor," and (4) "that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008).

Mandatory injunctions are "particularly disfavored" are "not granted unless extreme or very serious damage will result and are not issued in doubtful cases." *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 879 (9th Cir. 2009).

This Court reviews preliminary injunctions for an abuse of discretion, but reviews "any underlying issues of law *de novo*." *Norbert v. San Francisco*, 10 F.4th 918, 927 (9th Cir. 2021). "An overbroad injunction is an abuse of discretion." *Galvez v. Jaddou*, 52 F.4th 821, 834 (9th Cir. 2022) (citation omitted). So is reliance on "an erroneous legal standard or clearly erroneous finding of fact." *Meyer v. Portfolio Recovery Assocs., LLC*, 707 F.3d 1036, 1040 (9th Cir. 2012) (cleaned up). The district court also "abuses its discretion if its conclusions are without support in inferences that may be drawn from the facts in the record." *LA All. for Hum. Rts. v. Los Angeles*, 14 F.4th 947, 957 (9th Cir. 2021) (cleaned up).

## ARGUMENT

## I. There is not a constitutional right to access the Medical Team in the Medical Team Room.

The First Amendment does not "mandate[] a right of access to government information or sources of information within the government's control." *Houchins v. KQED, Inc.*, 438 U.S. 1, 15 (1978). The Supreme

Court has advised that courts "must not confuse what is 'good,' 'desirable,' or 'expedient' with what is constitutionally commanded by the First Amendment." *Id.* at 14. "To do so is to trivialize constitutional adjudication." *Id.*

Accordingly, "there is no constitutional right to obtain all information provided by FOIA laws." *McBurney v. Young*, 569 U.S. 221, 232 (2013) (collecting sources). And the "First Amendment does not guarantee the press a constitutional right of special access to information not available to the public generally." *Branzburg v. Hayes*, 408 U.S. 665, 684 (1972) (collecting sources). The Supreme Court has thus held that prison access policies are constitutional so long as they do "not deny the press access to sources of information available to members of the general public." *Pell v. Procunier*, 417 U.S. 817, 835 (1974).

## A. Ninth Circuit caselaw does not provide a right to access the Medical Team in the Medical Team Room.

This Court first addressed whether there is a right to access executions in *Cal. First Amend. Coalition v. Calderon*, 150 F.3d 976, 982 (9th Cir. 1998). There, California used its injection room like IDOC's Medical Team Room. Witnesses were not given access to California's injection room. Witnesses did not see the inmate be brought into the chamber,

placed on the gurney, have IVs inserted, or while he laid waiting for chemical to be administered. *Id.* at 979. Witnesses were only given visual access to the condemned moments before chemical was administered. *Id.*

*Calderon* held that California's policy did "not violate the First Amendment rights of either the press or the public." *Id.* at 982. And explained that "whatever First Amendment right might exist to view executions, the 'right' is severely limited." *Id.*

In *Cal. First Amend. Coal. v. Woodford*, which involved the same protocol as *Calderon* on a subsequent appeal of the same case, a different panel held that the policy was unconstitutional by finding a qualified right to watch condemned inmates during executions. 299 F.3d 868 (9th Cir. 2002).[2] To do so, the panel extended the "experience and logic" test from Supreme Court access to criminal adjudication cases, which asks whether the place and process has historically been open to the public and whether public access plays a significant role in the process's functioning. *Id.* at 874.

---

[2] This appears to be inconsistent with binding effect one panel has on another. *See Lair v. Bullock*, 798 F.3d 736, 747 (9th Cir. 2015) (explaining that a published panel decision is binding on other panels).

The panel held that "the public has a First Amendment right to view the condemned as he enters the execution chamber, is forcibly restrained and fitted with the apparatus of death." *Id.* at 877. The panel explained that its holding gives the public a "right to view executions from the moment the condemned is escorted into the execution chamber, including those 'initial procedures' that are inextricably intertwined with the process of putting the condemned inmate to death." *Id.*

The text of *Woodford* limits the scope of these "initial procedures" to watching the condemned. *Id.* at 876. To comply with *Woodford*, California had to let witnesses "view the condemned as the guards escort him into the chamber, strap him to the gurney and insert the intravenous lines," and thereafter until he was declared deceased. *Id.*

The "entirety" of an execution, including "initial procedures," does not extend past the condemned or the execution place. *Woodford*'s historical discussion establishes this. The panel explained that historically in California witnesses: (1) saw inmates "enter the execution place, be attached to the execution device and then die;" (2) watched hangings "in their entirety, from the condemned's ascent up the gallows to the fall of the trap door;" and (3) witnessed gas executions "from the time the

17

condemned was escorted into the gas chamber until pronouncement of death." 299 F.3d at 876. Based on this, the panel concluded that there was historical "support" "to view the condemned as the guards escort him into the chamber, strap him to the gurney and insert the intravenous lines." *Id*. IDOC provides this access.

In *First Amend. Coal. of Ariz. v. Ryan* ("*FACA*"), 938 F.3d 1069 (9th Cir. 2019), a panel extended *Woodford* to include a right to hear the condemned. Under Arizona's protocol, witnesses watched (via video) and heard (via microphone) the inmate enter the chamber, be secured to the gurney, make his last statement, and have IV lines inserted. *Id.* The panel labeled these parts the "initial procedures." *Id.*

After IVs were inserted, the monitors and microphone were turned off and the chamber's curtains were opened. *Id.* Witnesses viewed the execution from then on but could not hear the condemned. Witnesses never heard inside Arizona's chemical room.

The *FACA* panel held that there was a "right to hear the sounds of executions in their entirety." *Id.* at 1075. To comply with *FACA*, Arizona simply had to "leav[e] the microphone in the execution room on throughout the entire process." 938 F.3d at 1078. The panel did not require a

18

microphone in Arizona's chemical room. Thus, the entirety of the execution, including initial procedures, is limited to accessing the condemned person inside the execution place. IDOC provides this access.

*FACA* also reiterated the right's limited scope. The panel clarified that *Woodford* did *not* hold "that the public is entitled to all information that is 'inextricably intertwined' with executions." 938 F.3d at 1080. The panel explained that there is *not* a right to "examine executions in minute detail, such that witnesses could see the drug labels and the nametags of execution team members." *Id*. And that "*Woodford* did not change the default rule that the right of access does not extend to every piece of information that conceivably relates to a governmental proceeding, even if the governmental proceeding is itself open to the public." *Id*. (cleaned up).

*FACA* reinforced the principle that "whatever First Amendment right might exist to view executions, the 'right' is severely limited." *Calderon*, 150 F.3d at 982. These limitations were reinforced in *Pizzuto v. Tewalt*, 997 F.3d 893, 906 (9th Cir. 2021), and *Creech v. Tewalt* ("*Creech I*"), 84 F.4th 777, 790 (9th Cir. 2023) (both upholding IDOC's protocol).

These cases provide that whatever access the First Amendment may provide, the line of access is drawn at the condemned in the

execution place—the right is just to watch and hear a condemned person be executed. The cases did not create constitutionally required access to execution personnel. Just as the public may witness a defendant be convicted in open court—but not jury deliberations or matters occurring in the judge's chambers—whatever access the Constitution requires is limited to the condemned in the execution place.

This Court previously analyzed IDOC's protocol[3] and did not require access to the Medical Team or the Medical Team Room. *See Assoc. Press v. Otter*, 682 F.3d 821 (9th Cir. 2012). The *Otter* plaintiffs claimed a right "to witness all stages of the executions." *Id*. at 823. But *Otter* did not require access to the Medical Team Room, even though the plaintiffs sought access to the "entirety" and "all stages" of the execution. *Id*.

The district court correctly noted that this line of cases does *not* provide "binding precedent explicitly providing general audio and visual

---

[3] IDOC's protocol has been updated since *Otter* to comply with *Woodford* and *Ryan* regarding access to the condemned in the execution place. The Medical Team and Medical Team Room portions of the protocol are substantively the same.

access to the Medical Team Room." (2-ER-127, 130). But the district court erred by extending these cases for its injunction.

The district court erred by reading these cases to "provide for a broad interpretation of the type of execution access the public has a right to view, consistent with the ever-changing practices and procedures states employ to carry out capital punishment." (1-ER-10). This is wrong. The right identified by those cases is severely limited—the cases say so. *Calderon*, 150 F.3d at 982; *FACA*, 938 F.3d at 1080.

The district court also relied on two district court cases: *Guardian News & Media LLC v. Ryan*, 225 F. Supp. 3d 859 (D. Ariz. 2016); and *L.A. Times Commun., LLC v. Kernan*, No. 18-cv-02146-RS, 2018 WL 10419787 (N.D. Cal. Aug. 17, 2018). But neither case provides for the access granted by the district court—particularly at the preliminary injunction stage.

*Guardian News* involved two issues: (1) witnesses were not alerted when chemical was administered, and (2) Arizona could arbitrarily close the chamber's curtains and remove witnesses. 225 F.3d at 869–70. The court issued separate injunctions on both issues.

The court enjoined Arizona from: (1) "conducting lethal injection executions without providing a means for witnesses to be aware of the administration(s) of lethal drugs;" and (2) "clos[ing] the viewing of an execution absent the existence of a legitimate penological objective which would merit such closure." *Id.* at 870. The relevant injunction to this case is the first.

IDOC complies with *Guardian News* because IDOC alerts witnesses when chemical is administered. (2-ER-224). *Guardian News* did not require access to Arizona's chemical room—it just required "a means for witnesses to be aware of the administration(s) of lethal drugs." 225 F. Supp. 3d at 870. *Guardian News* did not require a specific means by which Arizona alerted witnesses. IDOC complies with *Guardian News* because it alerts witnesses when chemical is administered. (2-ER-224). *Guardian News* does not support the district court's injunction.

*Kernan* also does not support the district court's injunction. *Kernan* concerned a claim for similar access, but was analyzed on a motion to dismiss. 2018 WL 10419787, at *1. The *Kernan* court held that the plaintiffs could *state a claim* to extend *Woodford*, but noted, "No cases in this Circuit have since extended [*Woodford*] or opined on the right of access

to the specific portions of the execution process sought here." *Id*. at *3. *Kernan* does not support the district court's preliminary injunction.

IDOC's processes comply with Ninth Circuit caselaw. Whatever access the Constitution requires is limited to the condemned person in the execution place. There is no right of access to the Medical Team in the Medical Team Room. This Court should reverse.

## B. *Woodford* already stands on questionable footing, the district court abused its discretion by extending it further.

While the district court correctly noted that *Woodford* does not control (2-ER-127, 130), it erred by extending *Woodford*'s analysis to a different type of access. But courts have called *Woodford*'s approach into question (*see infra*), and held that there is not a right to access any part of an execution. It was an abuse of discretion to extend *Woodford*'s principles to a new area where *Woodford*'s analysis already stands on shaky ground.

The *Woodford* panel found a right to access executions by extending *Richmond Newspapers v. Virginia*'s "experience and logic" test, which found a right to access parts of criminal adjudications. 448 U.S. 555 (1980). But executions are fundamentally different from the criminal adjudicative processes.

23

The *Richmond* Court even distinguished access to penal institutions from courtrooms by explaining, "[*Pell*] and *Saxbe* are distinguishable in the sense that they were concerned with penal institutions which, by definition, are not 'open' or public places." *Id.* at 577 n. 11. The Court went on, "[p]enal institutions do not share the long tradition of openness, although traditionally there have been visiting committees of citizens, and there is no doubt that legislative committees could exercise plenary oversight and 'visitation rights.'" *Id.*

These differentiations are integral to *Richmond*'s holding and bar applying it to prison-conducted executions. *See U.S. v. Vongxay*, 594 F.3d 1111, 1115 (9th Cir. 2010) (explaining, "[c]ourts often limit the scope of their holdings, and such limitations are integral to those holdings."), *abrogated on other grounds by State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022).

The Supreme Court has never extended access beyond judicial proceedings; each extension has been confined to the criminal adjudicative process. *E.g., Press-Enter. Co. v. Superior Court* ("*Press-Enter. I*"), 464 U.S. 501 (1984) (child testimony); *Press-Enter. Co. v. Superior Court* ("*Press-Enter. II*"), 478 U.S. 1, 8–14 (1986) (preliminary hearings). But

executions are not part of the judicial process. The Supreme Court even upheld execution protocols requiring private executions and prohibiting reporters. *See Holden v. Minnesota*, 137 U.S. 483, 491 (1890) (explaining that these are "regulations which the legislature, in its wisdom, and for the public good, could legally prescribe in respect to executions ….").[4]

Unlike judicial proceedings, executions are handled by the executive department. Once a sentence is imposed, the prosecution is concluded, and the individual is committed to the executive department. Idaho Code § 19-2704. Executions are not within *Richmond*'s experience and logic scope.

Access to executions at prisons is a subset of access to prisons. While this Court once found a right to access prisons, the Supreme Court

---

[4] While the *Woodford* panel looked at *Holden*, it rejected it from foreclosing its right by that *Calderon* "declined to adopt such a categorical interpretation" and, it reasoned, was "inconsistent with more modern Supreme Court jurisprudence." 299 F.3d at 875 n. 3. But *Calderon* did not take that extreme of an approach—it acknowledged that *Holden* was applicable, upheld restrictions on access, never expressed disagreement with *Holden*, and reasoned that even if there was a right, it was not implicated. 150 F.3d at 982. *Woodford* also did not consider how more modern Supreme Court precedent rejects the right. *E.g., Richmond*, 448 U.S. at 577 n. 11; *Houchins*, 438 U.S. at 15.

25

reversed, holding no such right exists. *See KQED, Inc. v. Houchins* ("*KQED*"), 546 F.2d 284 (9th Cir. 1976), *rev'd*, 438 U.S. 1 (1978). The Supreme Court held that "[n]either the First Amendment nor the Fourteenth Amendment mandates a right of access to government information or sources of information within the government's control." *Houchins*, 438 U.S. at 15. And that decisions over prison access are "clearly a legislative task which the Constitution has left to the political processes," which "a legislative body might appropriately resolve one way or the other." *Id.* at 12. Because IDOC conducts executions within prisons, there is no right to access.

Moreover, the reason for public executions no longer exists. *See Richmond*, 448 U.S. at 573 (explaining that access need be "supported by reasons as valid today as in centuries past"). Public executions predate the penal system. *See* Harry Barnes, *Historical Origin of the Prison System in America*, 12 J. Am. Inst. Crim. L. & Criminology 35 (1921) (describing advent of the American prison system in the early 1800s). Public executions were designed to strike fear into the community to deter crime. But states subsequently adopted penal systems to fulfill those

needs. *See generally Historical Origin of the Prison System in America, supra.* The logic for public executions no longer exists.

Further, *Woodford*'s holding conflicts with stare decisis because it was contrary to binding precedent, *Calderon. Calderon* dealt with the same policy and held that the policy did "not violate the First Amendment rights of either the press or the public." 150 F.3d at 982. While *Calderon* remanded, it remained that *Calderon* held that the policy did not implicate anyone's First Amendment rights. *Id. Calderon* was binding on *Woodford's* panel. *Lair*, 798 F.3d at 747. The question of whether the policy violated anyone's constitutional rights was squarely foreclosed in *Calderon. Calderon*'s binding authority established that policies that provide the same or more access as California's do not violate the First Amendment. *Woodford*'s panel created a conflict that has confused courts for decades. *See also Atonio v. Wards Cove Packing Co.*, 810 F.2d 1477, 1478 (9th Cir. 1987) (en banc review is required to resolve conflict).

27

Since *Woodford*, every court (outside the Ninth Circuit) to address whether there is a right to access executions at penal institutions[5] has said no, and shown how *Woodford* was wrongly decided.

For example, *Ark. Times, Inc. v. Norris*, No. 5:07-cv-00195 SWW, 2008 WL 110853 (E.D. Ark. Jan. 7, 2008), confronted *Woodford* and evaluated, arguendo, whether experience and logic supports a right to access executions. 2008 WL 110853, at *2–5. The court determined that there is not an "unbroken, uncontradicted history of public access" to executions because executions became private in the 1830s. *Id*. at *4. The court did not find sufficient logic to make executions public, in part, because the public did not play "an indispensable functional role." *Id*. at *5. And held that there is no right to access executions. *Id*.

*Okla. Observer* also addressed *Woodford* and held that *Richmond*'s test did not apply to executions and there is not a right to access executions. 73 F. Supp. 3d at 1328. The court said that "there is considerable doubt that the [*Richmond*] exception even potentially applies to

---

[5] The only court outside of this Circuit to agree with *Woodford* is *Phila. Inquirer v. Wetzel*, 906 F. Supp. 2d 362 (M.D. Pa. 2012). But that case did not concern executions conducted at a prison.

[executions]." *Id.* at 1324. The court explained that its skepticism was "consistent with the [Supreme] Court's different treatment of access issues in the prison context, where the implementation of criminal sentences normally occurs." *Id.* And why, arguendo, even if the test applied, it does not support a right to access executions. The court said that *Woodford* "appears to be inconsistent with the Supreme Court's analysis in *Richmond Newspaper*." *Id.* at 1327.

*BH Media Grp., Inc. v. Clarke* held the same. 466 F. Supp. 3d 653, 659–65 (E.D. Va. 2020), *vacated and remanded on other grounds*, 851 F. App'x 368 (4th Cir. 2021) (case became moot when Virgina abolished executions). *BH Media* squarely addressed *Woodford* and *FACA*. The court focused on how *Woodford* and *FACA* relied on principles from *Pell*, and placed them onto *Richmond*, *Press-Enter. I*, and *Press-Enter. II*. *Id.* at 662. The court explained that this was suspect because *Pell* upheld regulations on prison access, predated the other cases, did not frame the analysis in any of them, and was only mentioned by *Richmond* to differentiate court access from prisons access. *Id.* The court said that *Woodford*'s use of *Pell* "is quite the reach," pointed out other problems with *Woodford*, and held that there is not a right to access executions. *Id.* at 660–66.

29

Another federal court recently held the same. *Associated Press v. Neal*, 1:25-cv-00872-MPD-MJD, 2025 WL 1692469 (S.D. Ind. May 16, 2025), *appeal pending*, No. 25-2025 (7th Cir.). The *Neal* court addressed *Woodford* and explained how its analysis was faulty. *Id.* at *4–6. The court held that *Richmond*'s test does not apply to the execution context because executions are not part of the adjudicative process. *Id.* at *5. The court explained, arguendo, that even if the experience and logic test applied, there was not a sufficient historical basis to "pass muster under *Press-Enterprise II*" and not sufficient logic to support the right. *Id.* at *6.

The district court abused its discretion by extending *Woodford* to different issues because *Woodford*'s right is "severely limited," conflicts with *Calderon*, and there are serious reasons to call *Woodford* into doubt. This Court should reverse.

## C. Even if *Woodford* could be extended, neither history nor logic support a right to access the Medical Team in the Medical Team Room.

The district court found that Plaintiffs were likely to succeed under *Richmond*'s "experience and logic" test, which asks (1) if there is a historical tradition of openness to the particular place or process, and (2) if

openness provides a significant positive role to the process's functioning. *Press-Enter. II*, 478 U.S. at 8–9. Plaintiffs failed to establish either prong.

### 1. There is not a history of accessing people like the Medical Team in places like the Medical Team Room.

Under the experience prong, there must be a history of access to a comparable part of the *particular* process. *See Creech I*, 84 F.4th at 789–90. The Supreme Court stated that there must be an "unbroken, uncontradicted history, supported by reasons as valid today as in centuries past" to make this finding. *Richmond*, 448 U.S. at 573. For example, *Richmond* found this was satisfied because when trials moved into courtrooms, "the community did not surrender its right to observe the conduct of trials" because there was immediately a 12-person jury system put in place, which remains to this day. *Id.*

The district court misinterpreted this prong's underlying legal principles. The district court opined that the analysis "is not whether witnesses have specifically been allowed access to the preparation and administration of lethal injection drugs occurring in the Medical Team Room, because execution methods have evolved over time …." (1-ER-16). Rather, the district court said the question is "whether there is a

31

historical tradition of access to the method and means used when conducting an execution." (*Id.*). This was erroneous.

It is not just whether the "method and means" have historically been open, it is whether the particular place or process has historically been open. *See Press-Enter. II*, 478 U.S. at 9 (explaining that the focus is on the "particular proceeding in question"). It is not sufficient to look broadly at whether executions were public, which the district court did. Instead, there must be an "unbroken, uncontradicted history" of access to comparable people performing similar tasks in analogous settings—grounded in reasons "as valid today as in centuries past." *Richmond*, 448 U.S. at 573.

The district court's error caused it to conflate *Woodford*'s access with the access sought here. But access to the condemned is different from access to execution personnel—or else the district court would not conducted this analysis because *Woodford* would have controlled.

At the preliminary injunction stage, Plaintiffs had to establish a historical tradition of access. *Lopez*, 680 F.3d at 1072. The Supreme Court confirmed that the "job of judges is not to resolve historical questions in the abstract." *Bruen*, 597 U.S. at 25 n. 6. Rather, courts "follow the

32

principle of party representation" and "decide a case based on the historical records compiled by the parties." *Id.* (citing *U.S. v. Sineneng-Smith*, 590 U.S. 371, 375 (2020)).

Plaintiffs did not present a historical argument addressing the matter at issue. *See also Stevens v. Mich. Ct.*, No. 21-1727, 2022 WL 3500193, at *6–7 (6th Cir. Aug. 18, 2022) (affirming dismissal of access claim for lack of historical evidence). Plaintiffs did not provide evidence establishing historical access to people like the Medical Team in places like the Medical Team Room. Plaintiffs did not present evidence of access to executioners tying nooses for hangings, cleaning rifles for firing squad, preparing chemical for gas executions, chairs for electrocution, nor sharpening blades for guillotines.

Plaintiffs could not present such evidence because "[h]istorically, the executioner was cloaked in anonymity to protect against retaliation by supporters of the condemned and to help communities find people to do the tough job." Mary D. Fan, *The Supply-Side Attack on Lethal Injection and the Rise of Execution Secrecy* ("*Supply-Side Attack*"), 95 B.U. L. Rev. 427, 428 (2015) (collecting sources). And there is a "longstanding

tradition of concealing the identities of those who carry out those executions." *Owens v. Hill*, 758 S.E.2d 794, 805 (Ga. 2014) (citations omitted).

Defendant provided the only authority on point—showing that executioners were historically shielded from public view. *See Okla. Observer*, 73 F. Supp. 3d at 1326; (2-ER-146, 208, 218, 234, 239–40). In *Okla. Observer*, the federal court found there was not a history of unbroken access to executions. *Id*. On point, it explained that for hangings, there was a "cord by which the trap was sprung ran into a booth adjoining the gallows, and was so arranged that the executioner could not be seen from the audience." *Id*.

That was the only source before the district court regarding access to executioners. Plaintiffs have not confronted the historical lack of access. The district court's finding of historical access to the Medical Team in places like the Medical Team Room was clearly erroneous.

 Plaintiffs' historical argument was limited. Plaintiffs based their argument almost entirely on *Woodford* and *FACA*. (2-ER-316–17). But those cases, at most, provide access to the condemned in the execution place. *FACA* just relied on the historical discussion in *Woodford*. 938 F.3d at 1075. And the *Woodford* panel said its historical evidence only provides

"limited public access" to "watch *the condemned inmate* enter the execution place, be attached to the execution device and then die." 299 F.3d at 876 (italics added). That is it.

*Woodford* does not support access to anything beyond the condemned in the execution place. *See also Okla. Observer*, 73 F. Supp. 3d at 1326 (explaining that it is "quite clear" that the history discussed in *Woodford* "is not the same 'unbroken, uncontradicted history' of access that the Supreme Court found persuasive in *Richmond* and its progeny."). The historical bases discussed in *Woodford* and *FACA* do not provide access to the Medical Team in Medical Team Room.

The only other "historical" basis identified in Plaintiffs' moving papers was *Schad v. Brewer*, No. CV-13-2001-PHX-ROS, 2013 WL 5551668 (D. Ariz. Oct. 7, 2013). Plaintiffs say that *Schad* holds that the "actual means of execution has historically been open and obvious." (2-ER-317). This is misleading and incorrect.

First, this Court rejected *Schad*'s analysis. *Schad* concerned a potential right to know information specific to the execution chemicals, like the manufacturer's name and the expiration date. This Court rejected

35

that claim in *FACA*, 938 F.3d at 1078–81, and *Pizzuto*, 997 F.3d at 906. *Schad*'s analysis cannot support Plaintiffs' claim.

Second, *Schad* has nothing to do with access to the Medical Team Room. The *Schad* court reasoned that execution chemical information allows the public to know the execution's "precise cause" and the "effects" of its means. 2013 WL 5551668, at *5. But information about chemical has nothing to do with watching an execution. Nevertheless, the access IDOC provides allows witnesses to know the "precise cause" and "effects" of the execution because the chemical is known, and witnesses have full access to the condemned. *See Creech v. Tewalt* ("*Creech II*"), 94 F.4th 859, 862 (9th Cir. 2024), *cert. denied*, 144 S. Ct. 1027 (2024) (explaining that IDOC disclosed its chemical). Plaintiffs' reliance on *Schad* is misplaced.

Third, the proposition is inaccurate. As explained in *Okla. Observer*, states have historically concealed the execution and executioner. 73 F. Supp. 3d at 1326–27. Idaho similarly shielded executions from public view. *See, e.g.,* Kathy Deinhardt Hill, *Hanged – A History of Idaho's Executions* ("*Hanged*"), 81 (2010) (explaining that Edward Rice's execution was shielded from view with curtains of muslin). Plaintiffs' reliance on *Schad* is misplaced.

Beyond that, Plaintiffs rely on their employee's, Ms. Boone, declaration. (2-ER-184–85, 192–98). Ms. Boone makes two claims. First, she says that the lever and hook used to suspend the noose in the execution chamber of House 5 of the Old Idaho Penitentiary is visible. (2-ER-193). Second, she contends that Idaho hung six people in the Rose Garden, and speculates that "the integrally intertwined aspects of the execution were not hidden behind closed doors." (*Id.*). Both claims are misleading and erroneous.

As to Ms. Boone's claim about executions in House 5, only one person, Raymond Snowden, was executed there. *Hanged*, 235. While media witnesses were invited, none witnessed.[6] *Id.* Thus, while the lever and hook *could* have been seen during one execution, neither the public nor press saw it. Plaintiffs cannot use this as a historical basis to access executions.

_____

[6] The district court notes that there were ten people at Snowden's execution. (1-ER-15). While technically true, those were only state officials—not members of the public or press. *Hanged*, 235. This cannot be used as a basis to claim that the public has a right to access executions.

Further, IDOC currently provides similar access to what *could* have been provided at House 5. Under IDOC's protocol, witnesses see and hear the condemned and are alerted when chemical is administered.

Ms. Boone's second claim is wrong. There were not six executions in the Rose Garden. *See generally Hanged*. Only two people, Ernest Walrath and Troy Powell, were executed there—conducted jointly in the middle of the night without witnesses. *Id*. at 127. Contrary to Ms. Boone's claim, no witness saw the "integrally intertwined aspects of the execution." *Id*.

Ms. Boone's claims are also misleading. The reason Walrath and Powell were executed in the Rose Garden is significant. The gallows were constructed there "to keep the affair as low key as possible." *Hanged*, 127. The warden denied all requests to witness. *Id*. Because there were no witnesses, Ms. Boone's claim that the "means and method of execution was open and visible" is wrong. The district court's acceptance of Ms. Boone's claims was clearly erroneous.

That is the entirety of Plaintiffs' factual basis. It does not support a constitutional right. Plaintiffs failed to present a historical basis to support their claimed right. Plaintiffs did not establish an unbroken history

respecting access to places like the Medical Team in the Medical Team Room. The district court's finding of historical openness was clearly erroneous.

Seemingly in acknowledgment that Plaintiffs did not meet their burden, the district court conducted its own independent fact research to overcome Defendant's arguments. (1-ER-15 (citing Betsy Russell, *News media have witnessed all but one Idaho state execution since 1901*, THE SPOKESMAN-REVIEW (June 4, 2012)). This was improper and this Court has determined that this constitutes an abuse of discretion. *LA All. for Hum. Rts.*, 14 F.4th at 957 (district court abused its discretion by relying on its "own independent research" to grant preliminary injunction); *see also Bruen*, 597 U.S. at 26 n.6 (courts rely on party presentation for historical arguments).

Moreover, the district court relied on a contention that "the media have watched all but one execution since 1901." (1-ER-15). But that's wrong. *See infra* § IC1a. And the allegation's source is suspect. Ms. Russell wrote the article to highlight her employer's involvement as a plaintiff in *Otter*.

Based on Ms. Russell's incorrect assertion, the district court disregarded Defendant's authorities to find that "the overwhelming majority of evidence supports Plaintiffs' assertion that media representatives were generally witnesses to the State's executions." (1-ER-15). That finding is clearly erroneous—particularly where executioners were historically hidden. *E.g., Okla. Observer*, 73 F. Supp. 3d at 1326.

### a. Historical events establish that there is no right to access executions, much less personnel in separate rooms.

Idaho's history further establishes the district court's errors. Idaho's territorial laws made executions private, subject to the sheriff's discretion. Idaho Rev. St. § 8021 (1887). That law provided, "no other persons than those mentioned in this section can be present at the execution, nor can any person under age be allowed to witness the same." *Id*.

While sheriffs sometimes allowed select witnesses, that was not always the case. For example, for William Reynolds' 1888 execution, the sheriff constructed a fence around the yard and a suspension system (instead of gallows) to ensure *no* witnesses saw the execution. *Hanged*, 194.

Under Idaho's pre-statehood laws, the default was no public access; an exception was required to allow witnesses. Even where the sheriff

40

allowed witnesses, access was still limited. The sheriff would prescribe the portions and extent witnesses could see.

After statehood, Idaho's Legislature enacted new execution laws mandating privacy. *See* Idaho Rev. St. §§ 8005–21 (1899). The amendment mandated that executions be done in a "suitable room or place, *closed from public view* within the walls of the State Penitentiary …." *Id.* § 8021[7] (italics added).

Edward Rice was the first person executed after statehood. *Hanged*, 81. Like Oklahoma, Idaho conducted Rice's execution with "[c]urtains of white muslin surround[ing] the structure blocking it from view …." *Hanged*, 81.

James Connor was executed in 1904. The warden "wanted no surprises and limited the audience to law officers and those specifically

---

[7] In *Otter*, the State raised this amendment to the district court, but not on appeal. *See Otter*, 682 F.3d at 824. The *Otter* panel did not address Idaho's history. *Id*. The historical basis raised here is more comprehensive than what the State raised below in *Otter*. These additional points and other facts and arguments establish that no constitutional right to access executions exists.

chosen for the task." *Hanged*, 207. Neither the press nor public witnessed. *Id.*

William Bond was executed in 1906 in front of a small number of people. *Id.* at 26. Fred Seward's 1908 execution was somewhat of an anomaly with about fifty witnesses. *Id.* at 35. In 1926, Noah Arnold was executed in the early morning hours before state officials and limited reporters. *Id.* at 93.

In 1926, John Jurko was executed shortly after midnight. *Id.* at 170. No witnesses saw Jurko's execution; only the warden and two guards were present. *Id.*

Powell and Walrath were executed in 1951 around midnight without witnesses. *Id.* at 127. And Idaho's last hanging was of Snowden, which was only witnessed by state officials. *Id.* at 235. Idaho's history establishes that there is *not* a historical experience of openness to executions as a whole, much less people like the Medical Team in places like the Medical Team Room.

Idaho is not alone.[8] History includes over 200 years of nationwide action to end public executions. Pennsylvania recommended abolishing public executions in 1824. J. of the 34th Hous. of Rep. of the Commw. of Pa, 706–09 (1823–24). Connecticut abolished public executions in 1830.[9] The other states did the same, for example: Rhode Island in 1833;[10] Pennsylvania in 1834;[11] New Jersey in 1834;[12] New York in 1835;[13] New Hampshire in 1836;[14] Mississippi in 1839;[15] Ohio in 1843;[16] Delaware in 1849;[17] Indiana in 1852;[18] the Kansas Territory in 1858;[19] the Colorado

---

[8] Legislative control over execution access also establishes that access is a political question reserved for legislatures. *See also Holden*, 137 U.S. at 491 (explaining that these are "regulations which the legislature, in its wisdom, and for the public good, could legally prescribe in respect to executions"); (2-ER-150, 204–05, 230–32).

[9] 1830 Conn. Laws, 284 § 147.

[10] 1833 R.I. Laws, 50–51.

[11] 1833–34 Pa. Laws, 234–35.

[12] 1834 N.J. Laws 170.

[13] 1835 N.Y. Laws 299 § 1.

[14] 1835 N.H. Laws, 241–42 § 5.

[15] 1839 Miss. Laws, 110 § 25.

[16] 1843 Ohio Laws, 71 § 1.

[17] 1849 Del. Laws, 366–67 § 1.

[18] 1852 Ind. Acts, vol. II, 379 § 134.

[19] 1858 Kan. Terr. Laws, 190.

Territory, Georgia, and Illinois in 1859;[20] the Montana Territory in 1864;[21] Oregon in 1874;[22] Nevada in 1875;[23] the Wyoming Territory in 1876;[24] the Utah Territory in 1878;[25] Maryland in 1882;[26] Tennessee in 1883;[27] Louisiana in 1884;[28] Missouri in 1887;[29] Minnesota in 1889;[30] California in 1891;[31] Nebraska and Washington in 1901;[32] New Mexico in 1903;[33] and the Arizona Territory in 1909.[34] States also moved to private

---

[20] 1859 Colo. Terr. Laws, 57 § 365 (judicial discretion was removed in 1889, 1889 Colo. Laws, 118 § 1); 1859 Ga. Laws, 62–63 § 1 (judicial discretion was removed in 1893, 1893 Ga. Laws, 41–42); 1859 Ill. Laws, 17 § 1.
[21] 1864 Mont. Terr. Laws, 250 § 222.
[22] 1874 Or. Laws, 115–116.
[23] 1875 Nev. Stat., 53 Ch. X.
[24] 1876 Wyo. Terr. Laws, 161 § 170.
[25] 1878 Utah Terr. Laws, 136 § 356.
[26] 1882 Md. Laws, 630–31 § 31.
[27] 1883 Tenn. 139–40.
[28] 1884 La. Laws, 102 No. 79.
[29] 1887 Mo, Laws, 169.
[30] 1889 Minn. Laws, 66 § 5.
[31] 1891 Cal. Laws, 274 § 1229.
[32] 1901 Neb. Laws, 506 § 2; 1901 Wash. Laws, 101.
[33] 1903 N.M. Laws, 141 Ch. 76 § 1.
[34] 1909 Ariz. Terr. Laws, 96–97.

executions when adopting the electric chair,[35] which was first adopted by New York[36] in 1888.

History also includes laws banning the press from reporting the details of executions. New York enacted the first of these laws in 1888;[37] Colorado and Minnesota did so in 1889;[38] Virginia in 1908;[39] Washington in 1909;[40] and Arkansas in 1913.[41] Minnesota's law even outright banned press attendance at executions. Laws like these were upheld when challenged. *See Minnesota v. Pioneer Press Co.*, 110 N.W. 867 (Minn. 1907) (upholding statute against state constitutional attacks).

Courts have analyzed history and determined that there is not a historical basis to access executions as a whole. *E.g., Okla. Observer*, 73 F. Supp. 3d at 1326. (explaining that unlike the historical record in *Richmond*, "[n]o comparable right exists … as to executions"); *Ark. Times*,

---

[35] *E.g.,* 1908 Va. Laws, 685.

[36] 1888 N.Y. Laws, 780 § 505 (New York abolished public executions in 1835, *see* n. 13).

[37] 1888 N.Y. Laws, 780 § 507.

[38] 1889 Colo. Laws, 119; 1889 Minn. Laws, 66–67 § 5.

[39] 1908 Va. Laws, 686.

[40] 1909 Wash. Laws, 952.

[41] 1913 Ark. Laws, 174 § 10.

2008 WL 110853, at *4 (holding that there is not a history of public access to executions). Where the inquiry is narrowed further to the Medical Team in the Medical Team Room, there is not historical support for a new constitutional right. *E.g., Okla. Observer*, 73 F. Supp. 3d at 1326.

***

Unlike the "unbroken, uncontradicted history" that the Supreme Court found persuasive in *Richmond*, no similar history exists regarding access to people like the Medical Team in the Medical Team Room. Plaintiffs failed to present a historical basis from which the district court could find a historical basis for access. This Court should reverse.

### 2. No functional importance is served by accessing the Medical Team in the Medical Team Room.

The logic inquiry asks whether public access plays a positive role in the functioning of the process. *Press-Enter. II*, 478 U.S. at 8–9. "[W]hat is crucial in individual cases is whether access to a particular government process is important in terms of that very process." *Richmond*, 448 U.S. at 589 (Brennan, J., concurring). The logic supporting access should be "supported by reasons as valid today as in centuries past." *Id.* at 573.

Courts have explained that the logic analysis involves weighing the pros and cons of access. *E.g., PG Pub. Co. v. Aichele*, 705 F.3d 91, 111 (3d

Cir. 2013). "Indeed, the logic analysis must account for the negative effects of openness, for otherwise it is difficult to conceive of a government proceeding to which the public would not have a First Amendment right of access." *Id.* (cleaned up).

The Supreme Court has opined that capital punishment serves three purposes: primarily, retribution and deterrence; and secondarily, incapacitation. *Gregg v. Georgia*, 428 U.S. 153, 183 n. 28 (1976). These purposes are not served by accessing the Medical Team in the Medical Team Room. Neither the district court nor Plaintiffs say otherwise. This Court should reverse on that basis alone.

The *Woodford* panel discussed other considerations: all concerned with the Eighth Amendment. *Woodford* focused on access as a means to see whether executions "comport[] with the evolving standards of decency." 299 F.3d at 876 (cleaned up). The panel also noted importance in the "appearance of fairness" and "see[ing] justice done." *Id.* at 876–77.

That is all accomplished by accessing the condemned in the execution place. It has nothing to do with watching personnel in other rooms. *Woodford*'s functional concerns do not extend past the condemned in the execution place. IDOC's processes comply with *Woodford*'s concerns.

47

The district court relied almost exclusively on *Woodford*'s discussion and that of *Woodford*'s district court. (1-ER-20–21). But the functional importance discussed there only provides reasons for accessing the condemned person—it does not apply to personnel.

The district court also reasoned that "viewing the means of enacting capital punishment may impact the public's view of acceptable methods of implementation of alternative methods." (1-ER-21). The district court cited *Calderon* for the claim that "eyewitness media reports of the first lethal gas sparked debate over this form of execution and the death penalty itself." *Id.* (quoting *Calderon*, 150 F.3d at 978).

But the district court overlooked that the interest is met solely by observing the condemned. Indeed, the district court overlooked that personnel were not in the chamber during gas executions. And the district court did not offer any basis to support a claim that witnesses to gas executions saw personnel preparing, administering gas, or any other time during the process. There is no functional importance in watching personnel in separate rooms during an execution or its preparations.

Courts have also explained that the functional importance of allowing witnesses under statutory schemes is to ensure that the state uses

the method it says it will. *See Ark. Times*, 2008 WL 11085, at *4 (explaining that the statute's purpose is to "verify that the execution was conducted in the manner required by law," i.e., lethal injection). That is accomplished under IDOC's processes.

The district court's required access also directs attention away from the condemned. Sounds from the Medical Team Room—the only place that the Medical Team must speak—detract from fully and adequately hearing the condemned. (*See also* 3-ER-409–10 (inmate may have softly groaned during IV insertion)). And if someone is watching the Medical Team on monitors, they cannot simultaneously be watching the condemned. The detractions from accessing the condemned must be assessed. The balance between accessing the condemned and the Medical Team must weigh in favor of accessing the condemned.

The people have spoken. States have determined that there is no purpose in accessing places like the Medical Team Room. There are twenty-seven states whose laws allow for the death penalty. Only one of those states known to Defendant, Arizona, allows *any* access[42] to its

---

[42] Arizona allows limited video access to see syringes.

49

Medical Team Room equivalent. The overwhelming majority of capital punishment states have determined that accessing places like the Medical Team Room serves no purpose.

And the reason why executioners may have been viewed back in the day—if they were—no longer exists. *But see Okla. Observer*, 73 F. Supp. 3d at 1326 (executioners were concealed in a booth). Any past executioner access stemmed from necessity, not design; states simply could not conceal them. Today, they can.

Even where the executioner was not concealed, he was "cloaked in anonymity" by the most effective means available for the time. *Supply-Side Attack*, 95 B.U. L. Rev. at 428. Where innovation has made a better "cloak," the history of concealing the executioner must be respected. Logic does not provide a basis for providing access to executions.

Further, analyzing criminal adjudications—the focus of the Supreme Court's experience and logic inquiry—shows there is no logic in accessing the Medical Team Room. While the Supreme Court found a right to access various portions of criminal trials, there is not a right to watch judges within chambers. There is not a right to install cameras and microphones in chambers with feeds to the public, even though cases

50

are decided there. There is not a right to access law clerks—even though clerks are necessary to the disposition of a case. And there is not a right to access jury deliberations, even though deliberations are the heart of adjudicative process. These are direct corollaries to the access the district court required.

While the press can attend court proceedings, this right is "no more than a right to attend the trial and report on their observations." *Radio and TV News Ass'n of S. Cal. v. U.S. Dist. Ct.*, 781 F.2d 1443, 1447 (9th Cir. 1986). And while newspersons can access what is "heard and seen in the courtroom," the "line is drawn at the courthouse door." *Nixon v. Warner Commun., Inc.*, 435 U.S. 589, 609 (1978) (collecting sources). If logic limits courtroom access to watching what unfolds from the gallery, then, at most, execution access is limited to observing the condemned in the execution place.

The district court mistook what *it* believed to be "good, desirable, or expedient with what is constitutionally commanded by the First Amendment." *Houchins*, 438 U.S. at 13. At the hearing, the district court provided hypotheticals for why *it* thought access was desirable. (2-ER-409–15). The district court's hypotheticals were not based on whether access

51

"plays a particularly significant positive role in the actual functioning of the process." *Press-Enter. II*, 478 U.S. at 11. Rather, the district court's reasoning was based on why someone might make a public records request if an execution goes awry. But there is not a First Amendment right to everything that may be within the scope of public records request laws. *McBurney*, 569 U.S. at 232. The district court conflated what it thought may be desirable under public records laws with what the Constitution requires.

The implications of the district court's injunction are far-reaching. If the Constitution mandates access to the Medical Team in the Medical Team Room, why not other rooms or other people? While the district court did not create the slippery slope—that was *Woodford*—its injunction exemplifies the slide. What's next? Will the timing of access be extended to the full month when a warrant is pending? Or to the processes of screening personnel, or securing execution supplies? That logically cannot be, but necessarily follows from the district court's injunction. Disregarding the "severely limited" nature of whatever access the First Amendment provides invites judicial micromanagement into every facet of prison

52

management. That disregards the deference required under the PLRA and Supreme Court precedent.

The district court abused its discretion in finding that accessing the Medical Team in the Medical Team Room serves a logical purpose. This Court should reverse.

## II. Even if the Constitution requires access, IDOC's processes satisfy unitary deferential review.

The *Woodford* panel determined that its right of access is subject to unitary, deferential review. 299 F.3d at 977. This standard asks, "whether the regulation is 'reasonably related' to legitimate penological objectives, or whether it represents an 'exaggerated response' to those concerns." *Id.* at 878 (citing *Turner v. Safley*, 482 U.S. 78, 87 (1987)). Four factors govern the analysis: (1) whether the regulation is rationally connected to a legitimate government interest; (2) whether there are alternative means of exercising access; (3) the impact access has on the penal institution; and (4) whether there are readily available alternatives to fully accommodate access at de minimis cost to valid penological objectives. *Turner*, 482 U.S. at 89–91.

The burden under this analysis "is not on the State to prove the validity of prison regulations but on the [challenger] to disprove it."

53

*Overton v. Bazzetta*, 539 U.S. 126, 132 (2003) (case brought by prisoners and non-prisoners, collecting sources).[43] The burden is weighty because courts "accord substantial deference to the professional judgment of prison administrators," who "defin[e] the legitimate goals of the corrections system" and "determin[e] the most appropriate means to accomplish them." *Id.* at 132. To meet this burden, Plaintiffs had to present "substantial evidence … to indicate that the officials have exaggerated their response to these considerations." *Pell*, 417 U.S. at 827.

The district court erred legally before reaching the factors. The district court placed the burden on the Defendant to prove the validity of IDOC's policy rather than analyzing whether Plaintiffs met their burden of clearly proving the policy is invalid. *Overton*, 539 U.S. at 132. This error goes to the heart of the injunction. This Court should reverse.

---

[43] Some of this Court's cases have incorrectly shifted this burden to the state. *See Jones v. Slade*, 23 F.4th 1124, 1144 (9th Cir. 2022); *but see Hrdlicka v. Reniff*, 656 F.3d 942, 946 (9th Cir. 2011) (O'Scannlain, J., dissenting (correctly addressing the burden)). But these cases rely on *Ashelman v. Wawrzaszek*, 111 F.3d 674 (9th Cir. 1997), which predates *Overton*, and are irreconcilable with Supreme Court precedent. Accordingly, placing the burden on the state is in error. *See also Lumumba v. Kiser*, 116 F.4th 269, 279 (4th Cir. 2024), *cert. denied*, 145 S. Ct. 1189, 221 L. Ed. 2d 266 (2025) (placing *Turner*'s burden on challenger).

That said, the district court also erred when applying the factors. *Turner*'s procedure of analysis is important. *Turner*'s first factor is rational basis review. *Evans v. Skolnik*, 997 F.3d 1060, 1071 n. 8 (9th Cir. 2021). If rational basis is satisfied, the Court then looks to the remaining factors to determine whether the process is reasonable or exaggerated. *See Shaw v. Murphy*, 532 U.S. 223, 229 (2001) (describing the analysis).

The district court did not do this. Instead, the district court overlooked the rational basis analysis to find that IDOC's processes were an exaggerated response because, the court reasoned, IDOC did not provide adequate evidence substantiating its reasonableness. (1-ER-23–26). This is erroneous because Defendant did not have to produce evidence where Plaintiffs, who bore the burden, did not present "evidence to refute a common-sense connection between the regulation and the government objective." *Jones*, 23 F.4th at 1135 (citation omitted). These errors warrant reversal.

Correctly applying *Turner* establishes that IDOC's processes are constitutional. *Turner*'s first factor is satisfied. Rational basis is a "highly deferential" "low bar" that presumes the regulation is valid. *Raidoo v. Moylan*, 75 F.4th 1115, 1118-19 (9th Cir. 2023); *Cleburne v. Cleburne*

55

*Living Ctr.*, 473 U.S. 432, 440 (1985). Rational basis upholds the process "as long as there is any reasonably conceivable state of facts that could provide a rational basis for the challenged [process]." *Merrifeld v. Lockyer*, 547 F.3d 978, 989 (9th Cir. 2008) (cleaned up). It "does not matter whether [courts] agree with the defendants or whether the policy in fact advances the [state's] legitimate interests." *Mauro v. Arpaio*, 188 F.3d 1054, 1060 (9th Cir. 1999) (cleaned up).

The "government is not required to substantiate its reasoning with facts." *Id*. The absence of supporting facts "has no significance in rational-basis analysis." *F.C.C. v. Beach Commc'ns, Inc.*, 508 U.S. 307, 315 (1993) (citation omitted). This is because the government's policy "is not subject to courtroom fact-finding and may be based on rational speculation unsupported by evidence or empirical data." *Id*. (collecting sources).

Prisons are thus *not* required to "demonstrate that the policy in fact advances [their] interest." *Prison Legal News v. Ryan*, 39 F.4th 1121, 1133 (9th Cir. 2022). It is "enough that officials 'might reasonably have thought that the policy' would do so." *Id*. (quoting *Mauro*, 188 F.3d at 1060).

56

The district court did not apply rational basis review. Defendant raised various legitimate interests—ability of the Medical Team to work as safely as possible, protection of the Medical Team from anti-death penalty advocates, preserving the dignity the process and those involved, maintaining anonymity for those involved, protecting Idaho's capital punishment abilities, upholding statutory duties, access not being constitutionally required, and conserving resources. (2-ER-141–50, 202–22, 228–248; 3-ER-380–424).

The district court recognized that at least some of IDOC's interests are legitimate. (1-ER-23–24 (acknowledging safety, security, and protecting identities are valid interests)). The rest are as well. *See Turner*, 482 U.S. at 93 (security and preservation of order and authority); *Freeman v. Tex. Dept. of Crim. J.*, 369 F.3d 854, 861 (5th Cir. 2004) (staff and space limitations and financial burdens); *Frazier v. Hamm*, No. 2:24-cv-732-ECM [WO], 2025 WL 361172, at *14 (M.D. Ala. Jan. 31, 2025) (safeguarding execution methods from outside influence); *Walker v. Beard*, 789 F.3d 1125, 1136 n.8 (9th Cir. 2015) (complying with state and federal constitutional requirements); *Workman v. Bredesen*, 486 F.3d 896, 909–10 (6th

57

Cir. 2007) (separating executioner from condemned); *Calderon v. Thompson*, 523 U.S. 538, 555 (1998) (finality of capital convictions).

The district court erred by demanding more from Defendant than required. The district court required Defendant to provide direct evidence to support IDOC's interests. (1-ER-24–26). But that was not required. *Mauro*, 188 F.3d at 1060. Plaintiffs did not present evidence sufficient to refute the common-sense connections between IDOC's policy and its legitimate interests. *Jones*, 23 F.4th at 1135. All Defendant had to show was that IDOC "might reasonably have thought that the policy would advance its interests." *Mauro*, 188 F.3d at 1060. Defendant did more than that. (2-ER-141–50, 202–22, 228–48: 3-ER-380–424).

For example, Defendant explained why the policy protects the Medical Team's safety, dignity, and well-being, IDOC's ability to utilize highly qualified personnel, and IDOC's ability to carry out lawful duties. (2-ER-213–14; 3-ER-392–95). Defendant cited authority, including Supreme Court cases, recognizing the history of people targeting those involved in capital punishment, threatening them (sometimes with death), and coercing them to quit. (2-ER-213–14 (collecting sources)); *see also Supply-Side Attack*, 95 B.U. L. Rev. at 439–41. Defendant explained that

58

the additional data points from Plaintiffs' requested access, taken together, make identification—and thus the inability to administer capital punishment—reasonably likely. (3-ER-394–95). Defendant articulated reasonable concerns about identification and safety protections, safeguarding Idaho's laws, and the ability to carry out lawful sentences.

Defendant explained that since *Otter*, Idaho enacted statutory protections for those involved in the process, including the Medical Team. Idaho Code § 19-2716A(4); *see also, e.g.,* S.C. Code § 24-3-580; Mont. Code § 46-19-103(5); Neb. Rev. Stat. § 83-967(2); Ohio Rev. Code § 2949.221(B); Okla. Stat. tit. 22, § 1015(B). Defendant explained that Idaho's Legislature passed its statute because it concluded that without these protections, capital punishment was "impossible to carry out." (2-ER-214 (citing Statement of Purpose, Hous. B. 633, 66th Leg., 2d Reg. Sess. (Idaho 2022)). Defendant articulated reasonable concerns about protecting personnel and upholding statutory duties.

Defendant also explained that IDOC's processes increase safety. Defendant explained that its processes allow the Medical Team to engage in their work without having to constantly worry about negative backlash (including death threats) from volunteering. (3-ER-416–17). Executions,

particularly tasks involving lethal chemical, require the utmost care and focus to ensure the task is conducted in as safe, constitutional, and dignified manner as possible. Where the smallest mistake can result in a cruel and unusual death, or serious harm to personnel, all distractions must be removed. IDOC takes these interests seriously and has created a process that ensures the Medical Team's full attention is focused on the task at hand—not on whether someone will be attacked for their role. *See McGehee v. Tex. Dept. of Crim. J.*, No. MC H-18-1546, 2018 WL 3996956, at *7 (S.D. Tex. Aug. 21, 2018) (explaining that people have threatened death to those involved the process).

Defendant also explained that providing unprecedented access will have a monetary cost. (2-ER-213; 3-ER-417–19). While Defendant did not cite a specific dollar figure, Defendant did not have to because Plaintiffs did not present any evidence that such cost is de minimis. *Mauro*, 188 F.3d at 1060. Defendant did, however, explain that there would be a cost and that it is difficult to find contractors for the job because they experience pressure from those opposed to capital punishment. (3-ER-417–19).

IDOC's policies pass constitutional muster. At minimum, Defendant established that IDOC "might reasonably have thought that the

policy would advance its interests." *Mauro*, 188 F.3d at 1060. The district court's findings to the contrary are legal error. This Court should reverse.

Because Plaintiffs failed to establish that IDOC's processes fail *Turner*'s first factor, and this factor "constitutes a *sine qua non*" for Plaintiffs' claim, the Court "need not consider the remaining factors." *Morrison v. Hall*, 261 F.3d 896, 907 (9th Cir. 2001) (citation omitted). Even so, the other factors also warrant reversal.

The second factor asks "whether there are alternative means of exercising the [claimed] right." *Turner*, 482 U.S. at 90. The Supreme Court has said that "'the right' in question must be viewed sensibly and expansively." *Thornurgh v. Abbott*, 490 U.S. 401, 417 (1989). Meaning not that access be viewed expansively, but whether access is available by "other means" that satisfy the broad underlying function. *Id*.

For example, *Turner* upheld regulations restricting inmate correspondence because other means of expression remained open. 482 U.S. at 92. *O'Lone v. Estate of Shabazz* upheld restrictions on attending a particular Muslim ceremony because inmates could attend other ceremonies. 482 U.S. 342, 351–52 (1987). *Thornburgh* upheld regulations on what publications inmates could possess, because regulations allowed "a broad

range of publications to be sent, received, and read." 490 U.S. at 417–18. And *Mauro* upheld regulations restricting access to sexually explicit material because inmates could receive explicit notes, articles, and photographs of clothed persons. 188 F.3d at 1061.

While the district court acknowledged IDOC's audible notification of chemical administration, it failed to apply this factor sensibly and expansively. Although the district court acknowledged that no binding case requires access to the Medical Team Room, it reasoned that IDOC could not meet this prong without providing unprecedented access. But the question is not just whether there is a general right to the challenged thing (or else *Turner*, *O'Lone*, *Thornburgh*, and *Mauro* would have rejected the policies). This factor simply looks to whether there is some accommodation of the broad underlying function.

The second factor is satisfied here. If there is a right to access the Medical Team Room, that access is satisfied because IDOC gives witnesses full access to the condemned person, notifies witnesses when chemical is administered, and witnesses can assess the effects of the chemical on the condemned.

62

The third factor—impact on the institution—is also satisfied. Under this factor, the Court must consider the "ripple effect" on the prison. *Turner*, 482 U.S. at 90. Where accommodation carries a "significant 'ripple effect,'" "courts should be particularly deferential to the informed discretion of corrections officials." *Id.* (citation omitted). This factor is "in part a restatement of the deferential balancing called for under the first factor[.]" *Amatel v. Reno*, 156 F.3d 192, 201 (9th Cir. 1998).

The district court looked to the financial impact of providing access. While acknowledging that access "will have a monetary expense," the district court disregarded any such expense, reasoning that "Defendant has provided no specific information as to what that would be." (1-ER-28–29). But Plaintiffs, who bore the burden, presented no evidence that these costs would be feasible or proportionate to any utility gained by the unprecedented access. Where the undisputed facts establish that there will be costs associated, the district court's speculation is not enough to find against Defendant on this factor.

The fourth factor—readily available alternatives—also weighs in favor of reversal. Neither Plaintiffs nor the district court pointed to an

alternative. *See also Prison Legal News*, 39 F.4th at 1136 (explaining that plaintiffs must "show that there are obvious, easy alternatives ….").

The district court reasoned that this factor could only be satisfied if IDOC fully complied with the new right. But the Supreme Court has explained, "the absence of ready alternatives is evidence of the reasonableness of a prison regulation." *Turner*, 482 U.S. at 91 (citation omitted). Defendant rejected Plaintiffs' proposed access for valid reasons and was thus not required to adopt it. *See Thornburgh*, 490 U.S. at 419 (prison officials can reject alternative out of reasonable fear that adoption will lead to greater harm and administrative inconvenience). Because the district court reasoned that there is no alternative, this factor is satisfied.

That said, IDOC's policy of alerting witnesses when chemical is administered constitutes an adequate alternative. Plaintiffs' purported purpose of accessing the Medical Team Room is to know when chemical is administered. The audible notifications satisfy this purpose.

The district court abused its discretion when analyzing the *Turner* factors. This Court should reverse.

64

## III.  The PLRA bars Plaintiffs from success on the merits.

The PLRA was enacted in response to "overzealous Federal courts micromanaging our Nation's prisons, and judicial orders entered under Federal law which have effectively turned control of the prison system away from elected officials accountable to the taxpayer, and over to the courts." *Gilmore v. California*, 220 F.3d 987, 996 (9th Cir. 2000) (cleaned up). To solve this, Congress enacted the needs-narrowness-intrusiveness test, which provides:

> **Prospective relief** in any **civil action with respect to prison conditions** shall extend no further than necessary to correct the violation of the Federal right of a particular plaintiff or plaintiffs. The court shall not grant or approve any **prospective relief** unless the court finds that such **relief** is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right. The court shall give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the **relief**.

18 U.S.C. § 3626(a)(1)(A) (bold terms defined).

"Prospective relief" means "all relief other than compensatory monetary damages." *Id*. § 3626(g)(7). "Civil action with respect to prison conditions" means, as relevant, "any civil proceeding arising under Federal law with respect to the conditions of confinement or the effects of actions

65

by government officials on the lives of persons confined in prison ….” *Id.* § 3626(g)(2). And “relief” means, as relevant, “all relief in any form that may be granted or approved by the court ….” *Id.* § 3626(g)(9).

The district court held that the needs-narrowness-intrusiveness test does not apply to this case because Plaintiffs are not incarcerated. (2-ER-132–33). This was legal error warranting reversal.

The district court relied on cases discussing other federal statutes. The district court pointed to cases discussing 28 U.S.C. § 1915A’s screening requirements, 42 U.S.C. § 1997e’s exhaustion requirements, and 28 U.S.C. § 1915’s availability of in forma pauperis for prisoners. But the district court’s analysis was erroneous because those provisions do not apply to 18 U.S.C. § 3626 and are definitionally limited to prisoners. *See* 28 U.S.C. § 1915A(a); 42 U.S.C. § 1997e(a); 28 U.S.C. §§ 1915(a)(1), (a)(2). Section 3626 does not include a “prisoner” limitation; it applies broadly to “any civil action with respect to prison conditions.”

The district court disregarded the distinctions between the different federal statutes, reasoning that “Defendant provides no support for his contention that while the rest of the PLRA seemingly only applies to claims brought by ‘prisoners,’ this section does not.” (2-ER-133). But

66

Defendant identified the basis for the distinction—the definitional scope. (2-ER-149–50); *see also Tanzin v. Tanvir*, 592 U.S. 43, 47 (2020) (explaining that statutory definitions "must" be followed "even if it varies from a term's ordinary meaning").

The district court disregarded how Congress defined the applicability of § 3626 broadly to "any civil proceeding … with respect to the conditions of confinement or the effects of actions by government officials on the lives of persons confined in prison"—regardless of who sues. The district court's error violates multiple rules of statutory interpretation. This was erroneous.

The district court also held that Plaintiffs' claim "do[es] not concern 'prison conditions' implicating [§ 3626]" because, it reasoned, Plaintiffs "are not challenging conditions of confinement, nor any actions by officials effecting the lives of persons in confinement." (2-ER-133). But that's wrong. Based on Plaintiffs' claim, the district court enjoined the State from carrying out any execution. Plaintiffs' requested relief is the functional equivalent of a stay of execution. Plaintiffs' claim involves the "effects of actions by government officials on the lives of persons confined in prison" because now no capital inmate's sentence can be carried out.

67

Also, the district court's discussion about *Richmond*'s logic prong was focused largely on monitoring for potential Eighth Amendment violations to the condemned person—further confirming that this case implicates § 3626. (*See* 1-ER-20–21). Because the district court's logic analysis hinged on the ability to assess potential constitutional violations to a condemned inmate, Plaintiffs' claim "effects of actions by government officials on the lives of persons confined in prison."

And this claim also affects "conditions of confinement" because Plaintiffs' claim revolves around what occurs during an execution, i.e., what people will see and hear when a death sentence is carried out. Inmates have even brought similar claims. *E.g., Creech I*, 84 F.4th at 789–90. Section 3626 applies.

The district court's PLRA analysis was erroneous. By failing to apply the needs-narrowness-intrusiveness test, the district court entered an unneeded, overly broad, and overly intrusive injunction. This Court should reverse.

68

## IV.    Plaintiffs are not irreparably harmed absent preliminary relief.

"Speculative injury does not constitute irreparable injury sufficient to warrant granting a preliminary injunction." *Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988) (citation omitted). While a "colorable First Amendment claim is irreparable injury," *Doe v. Harris*, 772 F.3d 563, 583 (9th Cir. 2014) (cleaned up), a tenuous claim is not. *Assoc. Gen. Contractors of Cal., v. Coal. for Econ. Equity*, 950 F.2d 1401, 1412 (9th Cir. 1991).

The district court's analysis on this factor was premised on a conclusion that Plaintiffs were likely to succeed on the merits. But the district court's merits determinations constitute an abuse of discretion. When properly analyzing Plaintiffs' claim, Plaintiffs are not likely to succeed. This Court should reverse.

## V.    The balance of equities and public interest weigh against preliminary relief.

"Both the State and the victims of crime have an important interest in the timely enforcement of a sentence." *Hill v. McDonough*, 547 U.S. 573, 584 (2006) (citation omitted). "Only with real finality can the victims of crime move forward knowing the moral judgment will be carried out."

69

*Thompson*, 523 U.S. at 556 (citation omitted). "To unsettle these expectations is to inflict a profound injury to the powerful and legitimate interest in punishing the guilty, an interest shared by the State and the victims of crime alike." *Id.* (cleaned up).

The district court enjoined all executions in Idaho. The district court overlooked the effect of its injunction by reasoning that it is speculative that its injunction would stop an execution. (1-ER-31–33). If that were true, why is there a need for a preliminary injunction? Nevertheless, it remains that no execution can be carried out unless IDOC complies with the district court's novel and unprecedented right. This conflicts with the public's interest and balance of equities.

Further, underlying the district court's analysis is a finding that Plaintiffs are likely to prevail. But that's wrong. At most, Plaintiffs stated a tenuous claim for a new right. But Plaintiffs' claimed right is an overextension of an already "severely limited" right, *Calderon*, 150 F.3d at 982, that has received serious criticism. *E.g., BH Media*, 466 F. Supp. 3d at 659–65. Plaintiffs are not likely to prevail.

The balance of equities and public interest weigh against a preliminary injunction. The district court abused its discretion to find otherwise. This Court should reverse.

## VI.  The district court's injunction is vague and overly broad.

Rule 65 dictates: "Every order granting an injunction must: (A) state the reasons why it is issued; (B) state its terms with specificity; and (C) describe in reasonable detail—and not by referring to the complaint or other document—the act or acts restrained or required." Fed. R. Civ. P. 65(d)(1). These specificity provisions are not "mere technical requirements." *Schmidt v. Lessard*, 414 U.S. 473, 476 (1974).

Rule 65 serves two "important" functions: (1) "to prevent uncertainty and confusion on the part of those faced with injunctive orders;" and (2) "to avoid the possible founding of a contempt citation on a decree too vague to be understood." *Id.* (collecting sources). "Generally speaking, an ordinary person reading the court's order should be able to ascertain from the document itself exactly what conduct is proscribed." *Columbia Pictures Indus. v. Fung*, 710 F.3d 1020, 1047–48 (9th Cir. 2013) (citation omitted). An injunction is "typically vacated when it violates this

standard." *Union Home Mortg. Corp. v. Cromer*, 31 F.4th 356, 362 (6th Cir. 2022).

The district court enjoined IDOC from conducting any execution unless it provides "audio and visual witness access to those medical team members that perform all tasks associated with the preparation and administration of the lethal injection drugs in the Medical Team Room." (1-ER-34).

The injunction is vague. Ordinary people cannot ascertain what "access to those medical team members that perform *all tasks associated* with the preparation and administration of the lethal injection drugs" means.

Does IDOC have to provide access for the entire day of an execution? Does IDOC have to give access when the chemical is stored in the Warden's custody? Does IDOC have to give access to trainings, even though trainings occur regardless of whether there is a death warrant? Does it require access to the Medical Team Room before the Medical Team obtains possession of the chemical? Does it mean IDOC must show everyone in the Medical Team Room, even the members tasked with observing the condemned person or monitoring the EKG machine? While

72

none of these scenarios were likely intended, they are valid interpretations of the court's order—all constituting absurd results.

The injunction is impermissibly vague because it does not provide Defendant notice of what is required. This Court should reverse.

The injunction is also overly broad. The injunction's text requires access to the Medical Team during "all tasks associated with the preparation and administration" of chemical. (1-ER-34). "All tasks" includes events occurring hours, days, and months before an execution, such as trainings. (*See* Add-0009 (discussing rehearsal requirements)). But Plaintiffs' Complaint does not seek access during these times. (3-ER-344–57); *see Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1140 (9th Cir. 2009) (injunctive relief "must be tailored to remedy the specific harm alleged"). And the injunction may include access to people who are only monitoring the condemned person or the EKG machine from within the Medical Team Room. But there is no functional purpose in access to them. The injunction is overly broad. This Court should reverse.

## CONCLUSION

For all these reasons, the district court's order should be reversed, and the preliminary injunction should be vacated.

Respectfully submitted this 20th day of June, 2025.

MOORE ELIA KRAFT & STACEY, LLP

*/s/ Tanner J. Smith*
Tanner J. Smith
Attorneys for Appellant

OFFICE OF THE ATTORNEY GENERAL

*/s/ Kristina M. Schindele*
Kristina M. Schindele
Deputy Attorney General
Attorneys for Appellant

## STATEMENT OF RELATED CASES

Pursuant to Circuit Rule 28-2.6, Defendant is not aware of any related cases pending in this Court. Defendant is aware that Plaintiff The Associated Press is involved in a similar case pending in the United States District Court for the Southern District of Indiana: *Assoc. Press v. Neal*, 1:25-cv-00872-MPD-MJD (S.D. Ind.), which was recently appealed to the Seventh Circuit, *Assoc. Press v. Neal*, No. 25-2025 (7th Cir.). Defendant is not aware of any other cases arising out of the same case, raising the same or closely related issues, or involving the same transactions or events.

Dated this 20th day of June, 2025.

MOORE ELIA KRAFT & STACEY, LLP

*/s/ Tanner J. Smith*
Tanner J. Smith
Attorneys for Appellant

## CERTIFICATE OF COMPLIANCE
## Form 8. Certificate of Compliance for Briefs

9th Cir. Case Number(s) <u>25-3312</u>

I am the attorney for Defendant Bree Derrick.

**This brief contains 13,988 words**, excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[X] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [ ] it is a joint brief submitted by separately represented parties.
    [ ] a party or parties are filing a single brief in response to multiple briefs.
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

Dated this 20th day of June, 2025.

MOORE ELIA KRAFT & STACEY, LLP

*/s/ Tanner J. Smith*
Tanner J. Smith
Attorneys for Defendants

## CERTIFICATE OF SERVICE

I hereby certify that on June 20, 2025, I electronically filed the fore-going with the Clerk of the Court for the United States Court of Appeals of the Ninth Circuit by using the appellate CM/ECF system.

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

Date: June 20, 2025

MOORE ELIA KRAFT & STACEY, LLP


*/s/ Tanner J. Smith*
Tanner J. Smith
Attorneys for Defendants