*Appeal No. 25-3312*

---

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

---

THE ASSOCIATED PRESS; THE McCLATCHY COMPANY, LLC, DBA THE IDAHO STATESMAN; EAST-IDAHO-NEWS.COM, LLC, DBA EAST IDAHO NEWS,

> *Plaintiffs-Appellees,*

v.

BREE DERRICK, IN HER OFFICIAL CAPACITY AS DIRECTOR OF THE IDAHO DEPARTMENT OF CORRECTION,

> *Defendant-Appellant.*

---

On Appeal from the United States District Court
for the District of Idaho
Hon. Debora K. Grasham
Case No. 1:24-cv-00587

---

## BRIEF OF APPELLEES

---

Wendy J. Olson, Bar No. 7634
wendy.olson@stoel.com
Anders Pedersen, Bar No. 11626
anders.pedersen@stoel.com
Stoel Rives LLP
101 S. Capitol Boulevard, Suite 1900
Boise, ID 83702
Telephone: 208.389.9000
Facsimile: 208.389.9040

*Attorneys for Plaintiffs-Appellees*

## RULE 26.1 CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, Plaintiffs-Appellees The Associated Press, The McClatchy Company, LLC, and East-Idaho-News.com, LLC, by and through undersigned counsel, state as follows: The Associated Press does not have any parent corporation, nor does any publicly held corporation own more than 10% of its stock. The McClatchy Company, LLC is wholly owned by SIJ Intermediate, LLC, a Delaware limited liability company headquartered in the State of New Jersey. SIJ Intermediate, LLC is wholly owned by SIJ Holdings, LLC, which is likewise a Delaware limited liability company headquartered in the State of New Jersey. SIJ Holdings, LLC is in turn wholly owned by SIJ Parent Holdings, LLC, which is also a Delaware limited liability company headquartered in the State of New Jersey. SIJ Parent Holdings, LLC is owned by a number of hedge funds managed by Chatham Asset Management, LLC. East-Idaho-News.com, LLC does not have any parent corporation, nor does any publicly held corporation own more than 10% of its stock.

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................iv

INTRODUCTION ........................................................................1

JURISDICTIONAL STATEMENT ..................................................3

STATEMENT OF THE ISSUES ON APPEAL ...............................3

STATEMENT OF THE CASE.........................................................4

    I.    Idaho's current execution procedures ................................4

    II.   Procedural history................................................................7

SUMMARY OF THE ARGUMENT ..............................................8

STANDARD OF REVIEW ...........................................................11

ARGUMENT ...............................................................................12

    I.    The Media Group is likely to succeed on the merits of its First Amendment claim ...........................................................13

        A.    The Media Group has a right of access to the means and methods of execution which occur in the Medical Team Room.....................................................................14

            i.    Ninth Circuit precedent regarding the right of access to executions extends to the Medical Team Room and the tasks performed in that room ................15

                1.    The right of access to executions in this Circuit is set by *Woodford* and its progeny, and includes the tasks performed in the Medical Team Room............................................15

                2.    *Woodford* and its progeny control, not *Calderon* ............................................24

            ii.    The Court correctly determined that there is a First Amendment Right of Access to the Medical Team Room under the *Press-Enterprise II* test ......................28

                1.    There is a historical tradition of public access to the executions......................................29

- i -

## TABLE OF CONTENTS
### (continued)

Page

2.    There is a historical tradition of access to the means and methods of an execution...................31

3.    The State of Idaho has a history of public access to executions ............................................33

4.    Access to the Medical Team Room, and the tasks performed there, plays a significant role in the functioning of capital punishment .....37

B.    The District Court properly determined that the IDOC's restriction of access was not reasonably related to a legitimate penological interest but was an exaggerated response....................................................................39

i.    The District Court correctly determined that the IDOC failed to show there was a legitimate penological interest reasonably related to its restriction on access.......................................................40

1.    The District Court properly found that the IDOC was required to provide some evidence that its proffered legitimate interests were reasonably related to those concerns..................................................................40

2.    None of the IDOC's proffered interests justify restricting access to the Medical Team Room. .......................................................41

ii.    The District Court correctly found that the IDOC's proffered alternative means of exercising the Media Group's right of access is not adequate..............46

iii.    The third and fourth *Turner* factors do not support restricting access.........................................................47

C.    The District Court addressed the PLRA only when it denied the IDOC's motion to dismiss. Thus, IDOC's arguments regarding the PLRA are not properly before this Court..................................................................48

- ii -

# TABLE OF CONTENTS
### (continued)

**Page**

    i.    The District Court's finding on the PLRA is not properly before this Court ............................................... 48

    ii.    The District Court correctly determined that the PLRA is not applicable ................................................. 49

        1.    The PLRA does not apply because the members of the Media Group are not prisoners. ............................................................ 49

        2.    The PLRA does not apply because this lawsuit does not concern prison conditions as defined by the PLRA ....................................... 50

II.    The District Court properly determined that the remaining preliminary injunction factors weigh in favor of a preliminary injunction ............................................................................. 52

III.    The District Court's injunction is not vague or overly broad ............ 53

CONCLUSION ..................................................................................... 55

129695859.1 0012094-00006

# TABLE OF AUTHORITIES

**Page**

## Cases

*Alabama Disabilities Advoc. Program v. Wood*,
  584 F. Supp. 2d 1314 (M.D. Ala. 2008)............................................................51

*Alliance for the Wild Rockies v. Cottrell*,
  632 F.3d 1127 (9th Cir. 2011) ........................................................................11

*Anderson v. Bessemer City*,
  470 U.S. 564 (1985)........................................................................................36

*Armstrong v. Newsom*,
  58 F.4th 1283 (9th Cir. 2023) ........................................................................50

*Associated Press v. Otter*,
  682 F.3d 821 (9th Cir. 2012) ...................................................................passim

*Associated Press v. Otter*,
  No. 1:12-cv-00255-EJL, 2012 WL 12977323 (D. Idaho June 5,
  2012), *rev'd and remanded*, 682 F.3d 821 (9th Cir. 2012) ...............................33

*Brown v. Plata*,
  563 U.S. 493 (2011)........................................................................................36

*Bucklew v. Precythe*,
  587 U.S. 119 (2019)........................................................................................32

*Cal. First Amend. Coal. v. Woodford*,
  299 F.3d 868 (9th Cir. 2002) ...................................................................passim

*California First Amendment Coalition v. Calderon*,
  150 F.3d 976 (9th Cir. 1998) ....................................................................24, 27

*California v. Azar*,
  911 F.3d 558 (9th Cir. 2018) ..........................................................................11

*City & Cnty. of San Francisco v. Trump*,
  897 F.3d 1225 (9th Cir. 2018) ........................................................................53

129695859.1 0012094-00006

# TABLE OF AUTHORITIES
### (continued)

**Page**

*Disabled Rts. Action Comm. v. Las Vegas Events, Inc.*,
  375 F.3d 861 (9th Cir. 2004) ...............................................................44

*Doe v. Harris*,
  772 F.3d 563 (9th Cir. 2014) ......................................................38, 47

*Drakes Bay Oyster Co. v. Jewell*,
  747 F.3d 1073 (9th Cir. 2014) ...........................................................12

*Edmo v. Corizon, Inc.*,
  935 F.3d 757 (9th Cir. 2019) ..............................................................50

*Enyart v. Nat'l Conf. of Bar Examiners, Inc.*,
  630 F.3d 1153 (9th Cir. 2011) ............................................................12

*Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of
  Educ.*,
  82 F.4th 664 (9th Cir. 2023) .......................................................52, 53

*First Amendment Coalition of Arizona, Inc. v. Ryan*,
  938 F.3d 1069 (9th Cir. 2019) ...................................................passim

*Glossip v. Gross*,
  576 U.S. 863 (2015).............................................................................32

*Guardian News & Media LLC v. Ryan*,
  225 F. Supp. 3d 859 (D. Ariz. 2016) .......................................passim

*Hallett v. Morgan*,
  296 F.3d 732 (9th Cir. 2002) ..............................................................50

*Hills v. Gautreaux*,
  425 U.S. 284 (1976)............................................................................54

*Holden v. State of Minnesota*,
  137 U.S. 483 (1890).............................................................................26

*Houchins v. KQED, Inc.*,
  438 U.S. 1 (1978).......................................................................25, 26

129695859.1 0012094-00006

# TABLE OF AUTHORITIES
(continued)

**Page**

*L.A. Times Commc'ns LLC v. Kernan*,
  No. 18-CV-02146-RS, 2018 WL 10419787 (N.D. Cal. Aug. 17,
  2018) ...................................................................................18, 21, 23

*Lamb-Weston, Inc. v. McCain Foods, Ltd.*,
  941 F.2d 970 (9th Cir. 1991) ..............................................................54

*Leigh v. Salazar*,
  677 F.3d 892 (9th Cir. 2012) ...........................................................3, 39

*Morrison v. Hall*,
  261 F.3d 896 (9th Cir. 2001) ......................................................40, 46

*Newton v. Thomason*,
  22 F.3d 1455 (9th Cir. 1994) ..............................................................27

*Nken v. Holder*,
  556 U.S. 418 (2009) ............................................................................53

*Oluwa v. Gomez*,
  133 F.3d 1237 (9th Cir. 1998) ............................................................50

*Pell v. Procunier*,
  417 U.S. 817 (1974) ............................................................................26

*Pimentel v. Dreyfus*,
  670 F.3d 1096 (9th Cir. 2012) ......................................................11, 29

*Press-Enterprise Co. v. Superior Court*,
  478 U.S. 1 (1986) ............................................................................2, 13

*Richmond Newspapers, Inc. v. Virginia*,
  448 U.S. 555 (1980) ........................................................................1, 25

*Roman Cath. Diocese of Brooklyn v. Cuomo*,
  592 U.S. 14 (2020) ..............................................................................52

*Saxbe v. Washington Post Co.*,
  417 U.S. 843 (1974) ............................................................................26

129695859.1 0012094-00006

# TABLE OF AUTHORITIES
### (continued)

**Page**

*Schad v. Brewer*,
No. CV-13-2001-PHX-ROS, 2013 WL 5551668 (D. Ariz. Oct. 7, 2013) ............................................................................................... 33

*Smith v. Marsh*,
194 F.3d 1045 (9th Cir. 1999) ................................................... 35, 42

*Spirit of Aloha Temple v. Cnty. of Maui*,
49 F.4th 1180 (9th Cir. 2022) ................................................... 38, 47

*Trop v. Dulles*,
356 U.S. 86 (1958) .............................................................................. 1

*Trueblood v. Washington State Dep't of Soc. & Health Servs.*,
No. C14-1178 MJP, 2016 WL 10703626 (W.D. Wash. Oct. 13, 2016) ................................................................................................. 51

*Turner v. Safley*,
482 U.S. 78 (1987) ..................................................................... passim

*United States v. Wilson*,
8 F.4th 970 (9th Cir. 2021) .............................................................. 35

*Winter v. Nat. Res. Def. Council, Inc.*,
555 U.S. 7 (2008) .............................................................................. 12

**Statutes**

18 U.S.C. § 3626(a)(1)(A) ...................................................................... 50

18 U.S.C. § 3626(g)(2) ........................................................................... 50

28 U.S.C. § 1292(a)(1) ............................................................................. 3

28 U.S.C. § 1331 ...................................................................................... 3

28 U.S.C. § 1343 ...................................................................................... 3

42 U.S.C. § 1983 ...................................................................................... 7

- vii -

## TABLE OF AUTHORITIES
(continued)

**Page**

Prison Litigation Reform Act...........................................................................passim

**Constitutional Provisions**

First Amendment...........................................................................................passim

United States Constitution .......................................................................25

**Other Authorities**

Betsy Z. Russell, *News media witnesses at Idaho executions an Idaho tradition since 1901*, The Spokesman-Review (Jun. 4, 2012), https://www.spokesman.com/stories/2012/jun/04/news-media-witnesses-executions-idaho-tradition/ .................................34

Craig Brandon, *The Electric Chair: An Unnatural American History* 39 (1999)...................................................................................32

John D. Bessler, *Televised Executions and the Constitution*: *Recognizing a First Amendment Right of Access to State Executions*, 45 Fed. Comm. L.J. 355, 359-64 (1993).........................................30

Kathy Deinhardt Hill, *Hanged – A History of Idaho's Execution* (2010) ...................................................................................35, 36

Louis P. Massur, *Rites of Execution* 114-16 (Oxford University Press 1989) .....................................................................................30

Neil E. Nussbaum, *Film at Eleven - Does the Press Have the Right to Attend and Videotape Executions?*, 20 N.C. Cent. Law J. 121, 123-24 (1992)....................................................................26, 31

Press Release, Idaho Dep't of Corr., *IDOC updates Execution SOP, Protocols* (Oct. 15, 2024) ...............................................................5, 44

Press Release, Idaho Dep't of Corr., *F-block retrofit update* (June 2, 2025) ...................................................................................44, 52

# INTRODUCTION

At its core, this case involves the press's ability to fulfill its "significant role in the proper functioning of capital punishment" by providing independent public scrutiny of the State of Idaho's execution process. *Cal. First Amend. Coal. v. Woodford*, 299 F.3d 868, 876 (9th Cir. 2002) ("*Woodford*"). The Ninth Circuit has not minced words: An informed discussion by the public "is critical in determining whether execution by lethal injection comports with 'the evolving standards of decency which mark the progress of a maturing society.'" *Id.* (quoting *Trop v. Dulles*, 356 U.S. 86, 101 (1958)). Only through the press, functioning as "surrogates for the public," can this critical debate take place in an informed manner. *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 572-73 (1980).

Under the Idaho Department of Correction's ("IDOC")[1] current Standard Operating Procedures for Executions ("SOP"), witnesses—which include four members of the press—will be able to view the Execution Preparation Room, where the medical team places intravenous ("IV") lines, and the Execution Chamber, where a condemned person is placed as the lethal injection drugs are administered and remains until pronounced dead. The witnesses will not, however, be allowed audio or visual access to the Medical Team Room despite the fact that the medical

---

[1] Because the Media Group has brought this suit against Bree Derrick in her official capacity as Director of the Idaho Department of Correction, the Media Group refer to the defendant as the IDOC.

team will undertake some of the most, if not the most, critical aspects of the execution process in this room. The Associated Press, The McClatchy Company, LLC, and East-Idaho-News.com, LLC (collectively, the "Media Group") bring this lawsuit to secure their (and the public's) First Amendment right of access to this significant part of an execution.

The IDOC tries to make this case something it is not. The Media Group does not seek to halt injunctions in Idaho. The Media Group does not seek access to ancillary details of Idaho's capital punishment. Instead, the question presented is narrow—does the public, and thus, the Media Group, have a right of access to the entirety of an execution, including the means and methods of carrying out that execution, i.e., the inextricably intertwined aspects of that process. Ninth Circuit precedent and the test set out in *Press-Enterprise Co. v. Superior Court,* 478 U.S. 1, 8-9 (1986) ("*Press-Enterprise II*") answer that question in the affirmative. The District Court agreed that the Media Group was likely to prevail on the merits of its First Amendment claim and enjoined the IDOC from restricting audio and visual access to the preparation and administration of the lethal injection drugs, which occur in the Medical Team Room. This Court should affirm.

Significantly, this is not the IDOC's first attempt at unconstitutionally limiting the public's access to critical aspects of the execution process. *See Associated Press v. Otter*, 682 F.3d 821, 824 (9th Cir. 2012) (enjoining Idaho from restricting

access to the initial stages of an execution on First Amendment grounds). It remains

that "[t]he free press is the guardian of the public interest," and "[i]f a government

agency restricts public access, the media's only recourse is the court system."

*Leigh v. Salazar*, 677 F.3d 892, 900 (9th Cir. 2012).

## JURISDICTIONAL STATEMENT

This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1343. The IDOC

filed a notice of appeal on May 21, 2025, appealing the District Court's order

granting a preliminary injunction against the IDOC on April 29, 2025. This Court

has jurisdiction to review that order under 28 U.S.C. § 1292(a)(1).

## STATEMENT OF THE ISSUES ON APPEAL

1.      Whether the District Court correctly found that the Media Group was

likely to succeed in showing a First Amendment right of access to the means and

methods of execution, specifically the preparation and administration of lethal

injection drugs, that occur in the Medical Team Room.

2.      Whether the District Court correctly found that the IDOC's proffered

legitimate penological interest in restricting access to the Medical Team Room was

not reasonably related to that restriction but instead was an exaggerated response.

3.      Whether the Prisoner Litigation Reform Act ("PLRA") has been

properly raised on appeal even though the District Court did not address it in its

order granting the preliminary injunction, and if the PLRA has been properly

raised, whether the District Court correctly found in denying IDOC's motion to dismiss that the PLRA is not applicable to this case.

4.     Whether the District Court properly found that the remaining preliminary injunction factors weighed in favor of the Media Group where the Media Group demonstrated a clear First Amendment interest.

5.     Whether the District Court's grant of a preliminary injunction was overly broad or vague.

## STATEMENT OF THE CASE

### I.     Idaho's current execution procedures

On October 15, 2024, the IDOC published its revised SOP, which applies to all staff members involved in the administration of capital punishment. Add-2. The revisions were made to reflect the physical changes to F Block at the Idaho Maximum Security Institution ("IMSI"), revise the qualifications for the medical team, clarify the execution process, and update the IV placement, syringe, and chemical preparation procedures. *Id*. At the same time, the IDOC released an Execution Chemicals Preparation and Administration document that provided a more detailed set of procedures for the actual execution of a condemned person. *See* Add-36.

Under IDOC's updated protocols, the execution of a condemned person begins by securing the person to a medical gurney. Add-40. The condemned person

is then escorted to the Execution Preparation Room, where the medical team will determine if peripheral IV access can be established. *Id*. If the medical team leader determines peripheral IV access is not attainable, a medical team member will establish a central line and affix electrocardiograph ("EKG") leads on the inmate. *Id*. The IDOC has stated that "[a] live, closed-circuit video and audio feed will be available to state and condemned witnesses for the entirety of the time the condemned person is in the execution preparation room." Press Release, Idaho Dep't of Corr., *IDOC updates Execution SOP, Protocols* (Oct. 15, 2024); *see also* 2-ER-331, ¶ 34.

Once the medical team has established IV access and connected EKG leads, the condemned person is escorted on a medical gurney to the Execution Chamber. *See* Add-40. From there, the medical team leader will attach the EKG leads to the monitor and confirm that the EKG monitor is functioning properly. The team leader will also attach the IV lines to established IV access and ensure they are flowing appropriately. *Id.* Surprisingly, no lethal injection drugs are administered in the Execution Chamber. *Id.* Rather, there is a small opening in the wall where the IV lines pass into the Medical Team Room. *See* 1-ER-3; 2-ER-328, ¶¶ 21-22.

Once all the necessary lines are attached, the medical team leader will leave the Execution Chamber and join the rest of the medical team in the Medical Team Room. *See* Add-40. From that point forward, it appears that only the IMSI Warden

will remain in the Execution Chamber, and the medical team will monitor the condemned person from a closed-circuit audio and video feed inside the Medical Team Room. Add-40-41.

Members of the medical team conduct several tasks inside the Medical Team Room that are fundamental to the process of executing a condemned person. Those tasks include preparing and labeling syringes that will be used to contain the lethal injection drugs; drawing the lethal injection drugs into the prepared syringes; tracking the syringes to ensure they are not damaged or mixed up; monitoring the condemned person through a closed-circuit feed; and monitoring the condemned person's vital signs through an EKG monitor. *See id.*; *see also* 2-ER-333, ¶ 49. Perhaps most importantly, team members inside the Medical Team Room are responsible for administering the lethal injection drugs from the prepared syringes into the IV lines attached to the condemned person. *See* Add-43; *see also* 2-ER-333, ¶ 50.

The medical team will remain in the Medical Team Room throughout the administration of the legal injection drugs. *See* Add-43; *see also* 2-ER-334, ¶ 52. Once all the lethal injection drugs are administered and all electrical activity of the condemned person's heart ceases, the medical team leader is responsible for advising the Ada County Coroner that the execution has been completed. At that point, the coroner will examine and pronounce the death of the condemned person. Add-43.

129695859.1 0012094-00006

All the witnesses will then be escorted out of the witness areas and the execution will be considered completed. *Id.*

Despite providing witnesses audio and visual access to the Execution Preparation Room and the Execution Chamber for the duration of the execution, the IDOC has refused to provide any access to the Medical Team Room. 2-ER-331-33, ¶¶ 35-47. As it stands, anything that happens in the Medical Team Room during an execution will be done in complete secrecy and free from any public scrutiny. Rather, the witnesses, including the media witnesses, will only be able to see the results of the activity in the Medical Team Room, without being able to see what precipitated those results.

## II. Procedural history

On December 6, 2024, the Media Group filed this lawsuit against Josh Tewalt,[2] in his official capacity as the Director of the IDOC, pursuant to 42 U.S.C. § 1983, alleging a First Amendment right of access claim stemming from the procedures and protocols used by the IDOC during executions by lethal injection. 3-ER-344-57. That same day, the Media Group filed a motion for preliminary injunction seeking to enjoin the IDOC's practice of restricting witness access to the Medical Team Room as part of IDOC's lethal injection execution procedure. 2-ER-

---

[2] Josh Tewalt has been replaced as the Director of the IDOC by Bree Derrick as reflected in the caption.

297-98. Specifically, the Media Group sought "general visual and audio access to the Medical Team Room similar to that already provided in the Execution Preparation Room or the Execution Chamber." 2-ER-305.

The IDOC opposed the Media Group's motion for preliminary injunction and simultaneously filed a motion to dismiss the Media Group's complaint. 2-ER-202-22; 2-ER-226-27. On March 6, 2025, the District Court denied the IDOC's motion to dismiss. 2-ER-105-34.

On April 8, 2025, the District Court heard oral argument on the Media Group's motion for preliminary injunction. 3-ER-584. The District Court granted the IDOC's motion for preliminary injunction enjoining the IDOC from limiting execution witnesses' audio and visual access to the preparation and administration of lethal injection drugs. 1-ER-33-35. The IDOC then filed its notice of appeal challenging that order. 3-ER-430-31.

## SUMMARY OF THE ARGUMENT

The District Court applied the evidence before it logically—using the correct legal standards—before preliminarily enjoining the IDOC from limiting audio and visual access to the preparation and administration of the lethal injection drugs. Its preliminary injunction should stand, and each of the IDOC's arguments to the contrary lack merit. The District Court properly determined that the Media Group is likely to prevail on the merits of its First Amendment claim, and that because they

showed a likelihood of constitutional injury, they would be irreparably harmed in the absence of injunctive relief. The court also correctly found that the balance of equities and public interest tipped in the Media Group's favor.

In this case, both clear Ninth Circuit precedent and the *Press-Enterprise II* test support the Media Group's First Amendment right to witness the tasks performed in the Medical Team Room. The Media Group's qualified right of access to the means and methods of execution, i.e., the preparation and administration of lethal injection drugs, is twofold. First, the law in this Circuit is clear. The public, and therefore the press, has a qualified right to view executions in their *entirety*, including all procedures that are inextricably intertwined with the process of putting the condemned inmate to death. There is little doubt that the preparation and administration of the lethal injection drugs, which take place entirely in the Medical Team Room under the IDOC's current SOP, are, at a minimum, inextricably intertwined with executing a condemned person. Thus, the First Amendment right of access to executions as defined by this Circuit encompasses the Medical Team Room.

Second, even if this Court finds that this matter is not directly answered by Ninth Circuit precedent, which it is, the Media Group has a right of access to the Medical Team Room under the Supreme Court's *Press-Enterprise II* test. Public viewing of executions in their entirety is rooted in historical tradition, and public

observation plays a significant role in the functioning of capital punishment. The historical access to open and unrestricted executions includes the means and methods of effectuating that process. This access is well documented and is supported by the only relevant evidence in the record. Further, there is little doubt that providing public access to some of the most integral parts of the execution process will aid in the determination of whether lethal injection executions are fairly and humanely administered, or whether they ever can be.

Additionally, the District Court correctly determined that the IDOC did not provide any legitimate penological interest that was reasonably related to its restriction of access to the Medical Team Room. In its decision, the District Court continuously applied the correct standard, and its decision was supported by the evidence (or lack thereof) in the record, Ninth Circuit authority, and common sense.

The IDOC's arguments regarding the PLRA are not properly before this Court on appeal. The District Court determined that the PLRA was not applicable in its order denying the IDOC's motion to dismiss, which has not been appealed, not in its preliminary injunction order. Moreover, the PLRA has no relevance here because none of the members of the Media Group are prisoners and because access to the Medical Team Room will not result in any change to the conditions of confinement or to the lives of persons confined in prison.

Finally, the District Court's carefully crafted injunction is not overly broad or

vague. Instead, the injunction is abundantly clear, easily understandable, and narrowly tailored to the constitutional violation. It requires specific access—audio and visual—to a specific part of the execution process – the preparation and administration of the lethal injection drugs.

Accordingly, this Court should affirm the District Court's order preliminarily enjoining the IDOC from prohibiting audio and video access to the preparation and administration of the lethal injection drugs.

## STANDARD OF REVIEW

A district court's grant of a preliminary injunction is reviewed for an abuse of discretion. *See California v. Azar*, 911 F.3d 558 (9th Cir. 2018). This Court reviews *de novo* whether the district court applied "'the correct legal standard'" and then "determine[s] 'if the district court's application of the correct legal standard was (1) illogical, (2) implausible, or (3) without support in inferences that may be drawn from the facts in the record.'" *Id.* (quoting *Pimentel v. Dreyfus*, 670 F.3d 1096, 1105 (9th Cir. 2012)). An appellant meets this high bar only where the district court's ruling is "based on an erroneous legal standard or a clearly erroneous finding of fact [that] amounts to an abuse of discretion." *Pimentel*, 670 F.3d at 1105 (citations omitted). "The district court's conclusions of law are reviewed *de novo* and its findings of fact for clear error." *Id.* (citing *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011)).

This Court "may affirm the district court on any ground supported by the record." *Enyart v. Nat'l Conf. of Bar Examiners, Inc.*, 630 F.3d 1153, 1159 (9th Cir. 2011).

## ARGUMENT

On April 29, 2025, the District Court granted the Media Group's motion for a preliminary injunction seeking general visual and audio access to the Medical Team Room as part of the IDOC's lethal injection procedure. 1-ER-33. The Court required that, if the IDOC elects to execute any condemned persons, it "it must provide audio and video access to the preparation and administration of the lethal injection drugs." 1-ER-35.

A party seeking a preliminary injunction must establish: (1) a likelihood of success on the merits; (2) irreparable harm in the absence of a preliminary injunction; (3) that the balance of equities weighs in favor of an injunction; and (4) that an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). When the government is a party, the last two factors merge. *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014).[3]

 The District Court properly found that the Media Group was likely to succeed on the merits of its First Amendment right of access claim, that the Media Group

---

[3] The IDOC does not argue that the District Court applied the wrong standard for evaluating a preliminary injunction. Rather, the IDOC challenges underlying legal principles and their application to the facts of this case.

will suffer irreparable harm in the absence of a preliminary injunction, and that a preliminary injunction promotes the balance of equities and public interest. 1-ER-6-35. The IDOC now appeals almost every one of the District Court's findings. But, the IDOC has failed to demonstrate that the District Court's decision was based on either an erroneous legal standard or a clearly erroneous finding of fact. Indeed, the District Court's findings were proper under the law of this Circuit and the circumstances of this case. Thus, this Court should affirm the District Court's preliminary injunction.

## I.     The Media Group is likely to succeed on the merits of its First Amendment claim

The First Amendment guarantees "a qualified right of access to governmental proceedings." *Woodford*, 299 F.3d at 873. That right extends not only to the general public, but also to the press. *Id*. at 873 n.2. To determine if a public proceeding is subject to a right of access, courts weigh two considerations: (1) whether the place and process have historically been open to the press and general public, and (2) whether public access plays a significant role in the functioning of the process in question. *Press-Enterprise II,* 478 U.S. at 8-9. Where this test is satisfied, a "qualified First Amendment right of public access" exists. *Id.* at 9.

If a right of access exists, the government may not restrict it without sufficient justification. *Id*. "The burden the government must meet to justify closure depends on the type of proceeding." *Guardian News & Media LLC v. Ryan*, 225 F. Supp. 3d

859, 866 (D. Ariz. 2016) (citations omitted). Where, as here, a right of access attaches to prison proceedings, access to the proceedings may only be limited if doing so is "reasonably related to legitimate penological objectives" and does not represent "an exaggerated response to those concerns." *Woodford*, 299 F.3d at 878 (internal quotation marks omitted) (quoting *Turner v. Safley*, 482 U.S. 78, 87 (1987)).

The IDOC does not contest that the District Court applied the correct standard when determining whether there is a right of access to the Medical Team Room. The only issue for this Court is whether the District Court's application of the standard was illogical, implausible, or without support in inferences that may be drawn from the facts in the record. It was not.

### A. The Media Group has a right of access to the means and methods of execution which occur in the Medical Team Room

In granting the preliminary injunction, the District Court held that the Media Group is "likely to succeed on the first *Press-Enterprise II* element – as access to the means and methods of conducting an execution, specifically here the preparation and administration of lethal injection drugs, is not ancillary information, but rather part of the process that is inextricably intertwined with the execution and has been historically open to the public." 1-ER-20. This finding was well reasoned, properly applied the law, and is supported by evidence in the record. Indeed, this Court should affirm the District Court's holding because both clear Ninth Circuit precedent and

the *Press-Enterprise II* test support the public's First Amendment right to observe the tasks performed in the Medical Team Room. Each is addressed below.

### i. Ninth Circuit precedent regarding the right of access to executions extends to the Medical Team Room and the tasks performed in that room

This Court should first uphold the District Court's finding that the Media Group was likely to prevail on its First Amendment claim because the tasks performed in the Medical Team Room, which are the means and methods of Idaho's execution procedure, fall within this Circuit's well defined First Amendment right to view executions in their entirety.

### 1. The right of access to executions in this Circuit is set by *Woodford* and its progeny, and includes the tasks performed in the Medical Team Room

*California First Amendment Coalition v. Woodford* is the seminal Ninth Circuit case on the public's First Amendment right to view executions in their entirety. *See* 299 F.3d at 868. In *Woodford*, the court considered whether a California regulation preventing witnesses from observing the initial steps of the execution process, during which the prisoner was brought into the execution chamber, was secured to the gurney, and had IV lines inserted, violated the public's First Amendment right to access government proceedings. *Id.* at 871. The Court used the two-prong *Press-Enterprise II* test, determining that public viewing of executions in their entirety is rooted in historical tradition and that it plays a significant role in the

- 15 -

functioning of capital punishment. *Id.* at 875-76. Finding that the *Press-Enterprise II* test was satisfied, the Ninth Circuit held "that the public enjoys a First Amendment right to view executions from the moment the condemned is escorted into the execution chamber, including those 'initial procedures' that are inextricably intertwined with the process of putting the condemned inmate to death." *Id.* at 877.

Nearly a decade after *Woodford*, the Ninth Circuit again addressed the public's right to view all aspects of an execution. *See Otter*, 682 F.3d at 824. In *Associated Press v. Otter*, media organizations challenged Idaho's then execution procedures, which only allowed witnesses to view the final portion of an execution. *Id.* at 823. The media organizations asserted that, as surrogates for the public, they had a right to witness all stages of an execution, rather than just the final portion. *Id*.

Agreeing with the media organizations, the Court found that the plaintiffs were "likely to succeed on the merits of their First Amendment claim … simply by pointing to [the Court's] prior opinion in [*Woodford*.]" *Id.* at 824. The Court explained that it already held "in the clearest possible terms" that "the public enjoys a First Amendment right to view executions from the moment the condemned is escorted into the execution chamber, including those 'initial procedures' that are inextricably intertwined with the process of putting the condemned inmate to death." *Id.* at 822 (quoting *Woodford*, 299 F.3d at 877). Applying this clear holding, the Ninth Circuit clarified that the "First Amendment protects the public's right to

witness *all phases* of [the condemned prisoner's] execution," including those initial portions Idaho sought to restrict. *Id.* at 824 (emphasis added).

The Ninth Circuit once again addressed the public's right to witness executions in *First Amendment Coalition of Arizona, Inc. v. Ryan*, 938 F.3d 1069 (9th Cir. 2019) ("*FACA*"). There, the plaintiffs claimed that Arizona was unconstitutionally restricting witnesses' ability to hear the sounds of the entire execution process. *Id.* at 1073. Under Arizona's procedures, witnesses were able to view the final stages of an execution through a window. But the audio feed that was used during the initial procedures was turned off except during limited updates from prison staff. *Id*.

Explaining that its decision followed "directly from the holding and reasoning of *Woodford*," the Court held that the "First Amendment right of access to governmental proceedings encompasses a right to hear the sounds of executions in their entirety." *Id.* at 1075. The Court reasoned that the historical public access described in *Woodford* included the ability to hear executions, and that access to the sounds of an execution plays a significant role in the proper functioning of capital punishment because "execution witnesses need to be able to observe and report on *the entire process* so that the public can determine whether lethal injections are fairly and humanely administered." *Id.* at 1076 (emphasis added) (citing *Woodford*, 299 F.3d at 876).

Although the Ninth Circuit has not specifically addressed the public's right to access a medical team room that functions as it does in Idaho, *Woodford* and its progeny require access here. The public's right of access to executions is not limited to some formulaic view of what qualifies as the actual execution but rather reflects "a more open interpretation" and understanding of the whole process. *See L.A. Times Commc'ns LLC v. Kernan*, No. 18-CV-02146-RS, 2018 WL 10419787, at \*4 (N.D. Cal. Aug. 17, 2018).

In an effort to avoid this Court's holdings in *Woodford* and *FACA*, IDOC tries to narrow their holdings in two ways. First, IDOC contends that *Woodford* limits the scope of the initial procedures to which there is public access to "watching the condemned" in the execution place. Appellant's Br. at 17, 20.

IDOC's categorical and narrow approach is not found in the cases. In *Woodford*, the defendant argued that the public did not have a right to view the initial execution procedures because an execution is defined as "beginning when the lethal chemicals start to flow." 299 F.3d at 876. The Court expressly rejected this argument. The Court stated that "[t]his definition" of when an execution begins was "simply of defendants' own making." *Id.*

Instead, this Court adopted a much broader approach to the public's right of access, including "'initial procedures' that are inextricably intertwined with the process of putting the condemned inmate to death." *Id.* at 877. In *FACA,* the Ninth

Circuit again applied this broader approach and explained "that the public has a qualified First Amendment right to view executions in their *entirety*," including the ability to hear the sounds from the Execution Chamber. 938 F.3d at 1075 (emphasis added) (citing *Woodford*, 299 F.3d at 875–77).

Nothing in these cases suggests that the right of access is limited to viewing and hearing only the condemned person in the location the condemned person is at any time. The right is to watch the entirety of executions, including the procedures inextricably intertwined with the process of putting a condemned person to death. That those procedures in Idaho have now been placed in a separate room from the condemned person does not remove these procedures from the execution process. The IDOC cannot defeat the right of access required by *Woodford* and *FACA* through clever construction that attempts to hide those integrally intertwined procedures.

Second, IDOC's attempt to characterize *FACA* as limiting the scope of the right to access focuses on the wrong facts from *FACA*. *See* Appellant's Br. at 19 ("*FACA* also reiterated the right's limited scope"). In its opening brief, the IDOC points to the *FACA* plaintiffs' claims for access to information regarding the lethal injection drugs. *FACA*, 938 F.3d at 1078 (in addition to their claim for access to view executions, plaintiffs asserted that the "First Amendment right of access to governmental proceedings entitles them to information regarding the manufacturers, sellers, lot numbers, National Drug Codes, and expiration dates of lethal-injection

- 19 -

drugs, as well as documentation regarding the qualifications of certain execution team members"). The Court in *FACA* determined that there was no public right of access to such information. *Id.* at 1079-80. But the Media Group here does not seek information about the specific lethal injection drugs used, their manufacturers, their expiration dates, or about the qualifications of certain execution team members. In fact, the Media Group does not seek any "information" about the execution process at all. Instead, the Media Group seeks visual and audio access to the Medical Team Room that is similar to the access already provided in the Execution Preparation Room or Execution Chamber. For this case, the relevant discussion of right to access in *FACA* is thus the Court's analysis of whether the right to access required the sound to be left on during the actual execution. Recognizing its own precedent in *Woodford* that "the public has a First Amendment right to view executions in their *entirety*," *FACA*, 938 F.3d at 1075 (emphasis added), including all procedures that are "inextricably intertwined with the process of putting the condemned inmate to death," *Woodford*, 299 F.3d at 877, the Court in *FACA* determined that the right of access does extend to observing the sounds of the execution. 938 F.3d at 1076; *see also Otter*, 682 F.3d at 824 ("[*Woodford*] makes clear that the First Amendment protects the public's right to witness all phases of Leavitt's execution, including the portion that the State now shields from view.").

The District Court understood these cases correctly, applied them properly,

129695859.1 0012094-00006

and crafted its injunction accordingly. Here, the tasks the medical team performs in the Medical Team Room fall squarely within the scope of the right to access as defined by the Ninth Circuit. Under the IDOC's current protocol, the team members inside the Medical Team Room are responsible for tasks such as preparing and labeling syringes; drawing the lethal injection drug or drugs into the prepared syringes; tracking the syringes to ensure they are not damaged or mixed up; monitoring the condemned person through a closed-circuit camera; and monitoring the condemned person's vital signs through an EKG monitor or other medical equipment. *See* Add-40-41; 2-ER-333, ¶ 49. Additionally, the medical team administers the lethal injection drugs into the IV lines inside the Medical Team Room. In other words, the tasks that are involved in initiating and carrying out an execution occur inside the Medical Team Room. Thus, these tasks are not just "inextricably intertwined" with the execution process but are also its most critical. Without them, the State cannot perform an execution by lethal injection. Thus, the public's First Amendment right of access to executions encompasses observing the processes that occur in the Medical Team Room.

Notably, the two other district courts in this Circuit to consider this question have relied on *Woodford* and *FACA* similarly to find that the public's right to witness an execution applies with equal force to the activities undertaken in a "chemical" or "medical" room. *See, e.g., Guardian News*, 225 F. Supp. 3d at 869; *Kernan*, 2018

WL 10419787, at *4. In *Guardian News*, a group of media outlets challenged Arizona's execution protocol, seeking the right "to see and hear the totality of an execution, including whether the State is administering additional doses of lethal injection drugs." 225 F. Supp. 3d at 867. Like Idaho's current protocols, Arizona used multiple rooms to conduct executions, including a witness room; an execution room; and a chemical room, where the special operations team prepared the drugs and syringes, and eventually injected them into the IV lines. *See id.* Again, like the IDOC's SOP, witnesses in Arizona were able to observe the placement of IV lines through a closed-circuit feed, at which point the curtains to the execution room were removed and the witnesses could view the condemned prisoner through a window during the final stages of an execution. *Id*. However, at no point during the execution were the witnesses able to view or hear what was happening in the chemical room. In other words, just like in Idaho, witnesses could always see and hear the condemned person during the execution, but they could not see what was happening in the separate room where the lethal drugs were mixed and injected into the prisoner's IV lines. *Id*.

The district court held that *Woodford* applied "with equal force to the administration (or subsequent administrations) of doses of the lethal injection drugs when and if such additional injections are deemed necessary." *Id*. at 868. The district court granted summary judgment in favor of the media outlets and permanently

enjoined the state from conducting lethal injection executions without providing a means for the witnesses to be aware of the events taking place in the chemical room. *See id.* at 870; *see also Kernan*, 2018 WL 10419787, at *5 (finding that the allegations were "sufficient to state a plausible claim [that] preparing the chemicals is inextricably intertwined with the execution process—including the process of administering the chemicals which [*Woodford*] has already found a right of access to observe").

As the district courts in Arizona and California—and the District Court here—found, there is no logical reason why the events that will take place in the Medical Team Room should fall outside the scope of the well settled First Amendment right to view an execution in its entirety. The tasks that the medical team will undertake in the Medical Team Room, are, at a minimum, "inextricably intertwined with the execution process," and are more accurately categorized as the active part of the execution, which the Ninth Circuit has held "in the clearest possible terms" is covered by the First Amendment right of access. *See Otter*, 682 F.3d at 822. Indeed, the District Court here "struggle[ed] to think of a more vital step of the execution process than the actions taken by the medical team while in the Medical Team Room, because without such actions, the execution would not occur." 1-ER-19 (citing *Woodford*, 299 F.3d at 877). The district courts in this circuit have well understood this Court's precedent providing a First Amendment right of access to the entirety

of an execution and applied it to the chemical or medical team room. This Court should affirm here.

### 2. *Woodford* **and its progeny control, not** *Calderon*

The IDOC has repeatedly attempted to rely on *California First Amendment Coalition v. Calderon*, 150 F.3d 976, 982 (9th Cir. 1998), and its "severely limited" language, to somehow narrow the Ninth Circuit's approach to the First Amendment right of access to executions. The District Court properly rejected this argument and analysis. 1-ER-10 ("The applicable Ninth Circuit cases of *CFAC, Otter,* and *Ryan* provide for a broad interpretation of the type of execution access the public has a right to view, consistent with the ever-changing practices and procedures states employ to carry out capital punishment."). This Court's opinion in *Woodford*, which addressed the question left undecided in *Calderon*, and its progeny govern, and the District Court properly relied on them.

*Calderon* did not address the question at hand. In *Calderon,* the Court stressed that it was "not holding that the public and the press do not have First Amendment rights to view executions." *Id*. In fact, the Court assumed such a right likely did exist. *Id*. at 982. But it found that California's execution procedures at the time were not unconstitutional, in large part, because it did "not have substantial evidence" in the record, and therefore, it deferred to the prison officials and procedures in place. *Id*. at 983. Additionally, because *Calderon* did not address the issue, it did not establish

precedent on the scope of the First Amendment right of access to executions. *See Woodford*, 299 F.3d at 873 ("In [*Calderon*] we assumed without deciding that the public had a 'severely limited' First Amendment right to view executions." (citation omitted)). It was not until *Woodford* that the Ninth Circuit squarely addressed the relevant issue—whether there is a First Amendment right of access to executions. Thus, it is *Woodford* and its progeny—all decided after *Calderon*—that set the scope of the public's (and thus, the press's) First Amendment right of access to executions.

The IDOC's claim that *Woodford* stands on questionable grounds also has no merit. *See* Appellant's Br. at 23-30. To make its argument, the IDOC primarily relies on two types of cases, Supreme Court cases decided decades before *Woodford*, and district court cases from outside jurisdictions. Neither of these categories of cases call *Woodford* into question. This Circuit continued to rely on *Woodford* in *Otter* and *FACA*, and all of these opinions were rendered decades after the Supreme Court authority cited by IDOC for the proposition that *Woodford* is not good law. While some of the cited decisions do discuss a First Amendment right of access in the general prison setting, none of them address the relevant issue here—whether the public (and thus the press) has a right of access to executions, or what that right of access requires. *See, e.g., Richmond Newspapers, Inc*, 448 U.S. at 558 (addressing the "narrow question" of "whether the right of the public and press to attend criminal trials is guaranteed under the United States Constitution"); *Houchins v. KQED, Inc.*,

438 U.S. 1, 16 (1978) (holding that the media does not have a special right of access to a county jail "different from or greater than that accorded the public"; however, here, the media's right is coextensive with that of the public); *Pell v. Procunier*, 417 U.S. 817 (1974) (addressing whether the media has a right to unrestricted access to interview designated prisoners); *Saxbe v. Washington Post Co.*, 417 U.S. 843 (1974) (same). Further, the Supreme Court's decisions in *Houchins*, *Pell*, and *Saxbe* emphasized that the media does not possess a greater right of access than the public in the prison setting. That is entirely consistent with the Ninth Circuit decisions in *Woodford*, *Otter*, and *FACA* finding that the media's rights are explicitly derived from the rights of the general public, not some greater right reserved for the media.

Out of all the authority the IDOC relies on to question *Woodford's* soundness, only *Holden v. State of Minnesota*, 137 U.S. 483 (1890), involves executions. However, *Holden* does not undermine *Woodford* or its progeny, nor does it stand for the broad propositions that the IDOC claims it does. *Holden*, a case that is more than 130 years old, involved a condemned prisoner's ex post facto challenge to the Minnesota state statute then governing his execution. Although the challenged statute in *Holden* did have provisions banning witnesses, the case did not involve any First Amendment challenge to those provisions. *See* 137 U.S. at 491; *see also* Neil E. Nussbaum, *Film at Eleven - Does the Press Have the Right to Attend and Videotape Executions*?, 20 N.C. Cent. Law J. 121, 123–24 (1992) ("There were no

media plaintiffs in *Holden* challenging the right of the state to limit their access to executions or their power to publish unrestricted accounts of executions. Nor did the condemned challenge the statutes as violative of his constitutional rights." (citation omitted)).

In fact, *Woodford* explicitly addresses *Holden*. In *Woodford*, the defendant argued that *Holden* foreclosed any recognition of a First Amendment right to view executions. *See* 299 F.3d at 875 n.3. The Court then noted that the Ninth Circuit had already declined to adopt such a categorical interpretation of *Holden* in its prior decision. *Id*. (citing *Calderon*, 150 F.3d at 982). The Court explained that "*Holden* was primarily concerned with ex post facto issues, did not expressly discuss the First Amendment and the Court's passing references to restrictions on the media are inconsistent with more modern Supreme Court jurisprudence[.]" *Id*. Therefore, the Ninth Circuit has already decided that *Woodford* and its progeny can coexist with *Holden*.

Second, the out-of-circuit district court decisions that the IDOC relies on are not binding on this Court. *Newton v. Thomason*, 22 F.3d 1455, 1460 (9th Cir. 1994) ("[b]inding precedent for all [courts] is set only by the Supreme Court, and for the district courts within a circuit, only by the court of appeals for that circuit [in the absence of Supreme Court authority]" (alterations in original; citation omitted)). Simply put, the IDOC has not provided any reason to question whether *Woodford*

and its progeny remain governing law in this Circuit.

Accordingly, there is nothing that should deter this Court from continuing to apply well settled Ninth Circuit law broadly defining the scope of the public's right of access to executions. Moreover, the Media Group's requested access falls squarely within this Circuit's broad definition that "the public has a First Amendment right to view executions in their *entirety*," *FACA*, 938 F.3d at 1075 (emphasis added), including all procedures that are "inextricably intertwined with the process of putting the condemned inmate to death," *Woodford*, 299 F.3d at 877. Thus, the District Court correctly determined that the Media Group was likely to succeed in establishing that the public has a qualified right of access to the Medical Team Room, and that the tasks performed in that room are inextricably intertwined with the execution of a condemned person.

### ii. The Court correctly determined that there is a First Amendment Right of Access to the Medical Team Room under the *Press-Enterprise II* test

Even if this Court finds that this matter is not directly answered by *Woodford* and its progeny, which it is, it should still affirm the District Court's independent determination that the public, and therefore the Media Group, has a right of access to the Medical Team Room under the *Press-Enterprise II* test. Indeed, the Ninth Circuit has consistently "determined that public viewing of executions *in their entirety* is rooted in historical tradition and that public observation plays a significant

role in the functioning of capital punishment." *FACA*, 938 F.3d at 1075 (emphasis added) (citing *Woodford*, 299 F.3d at 875-77).

The IDOC argues that the Media Group failed to establish both prongs, and thus that the District Court erred in finding that it did.[4] Not so. In analyzing the *Press-Enterprise II* test, the District Court properly applied the relevant law and found that (1) there is a historical tradition of access to the means and methods of an execution, and (2) that public access to those tasks, which occur in the Medical Team Room, plays a significant positive role in the proceeding. 1-ER-11-20; 1-ER-20-21. These findings were proper. Each will be addressed in turn.

### 1. There is a historical tradition of public access to the executions

Both the facts before the District Court and Ninth Circuit and District of Idaho case law show that there is a historical tradition of public access to executions. That historical access is well documented.

The Ninth Circuit has explained that "[h]istorically, executions were open to

---

[4] In large part, the IDOC's challenges to the *Press-Enterprise II* test ask that this Court reweigh the evidence hoping for another outcome. However, that is not the task before this Court on appeal. The correct question is whether the District Court applied the correct legal standard and then whether that application was illogical, implausible, or without support in inferences that may be drawn from the facts in the record. *See Pimentel*, 670 F.3d at 1105. The District Court correctly identified that the *Press-Enterprise II* test controlled the question here, and its application of that standard was well reasoned, thoroughly analyzed, and amply supported by inferences from facts in the record.

all comers[,]" and "[e]xecutions were fully open events in the United States[.]" *Woodford*, 299 F.3d at 875. In England and the United States, executions were historically "open to all comers" and "fully open events[.]" *Id.*; *see also* John D. Bessler, *Televised Executions and the Constitution*: *Recognizing a First Amendment Right of Access to State Executions*, 45 Fed. Comm. L.J. 355, 359-64 (1993). Further, once executions were moved into prisons, procedures were implemented to ensure that executions would remain open to some form of public scrutiny. *See Woodford*, 299 F.3d at 876 (finding that "when public executions were first abolished in America, the press was still allowed to attend") (citing Louis P. Massur, *Rites of Execution* 114-16 (Oxford University Press 1989)). The Court in *Woodford* further explained that "[t]he public and press historically have been allowed to watch the condemned inmate enter the execution place, be attached to the execution device and then die." *Id.*

No part of this process was conducted remotely from a location witnesses could not observe. Because executions were generally open, the public was able to view the means and methods of execution. That is, the public has a history of being able to see the entirety of a hanging, including the gallows, the rope being used to hang an inmate, the device used to trigger the hanging, and the actions of the executioner as he effectuated capital punishment. *See id.* ("witnesses were permitted to view hangings 'in their entirety, from the condemned's ascent up the gallows to

the fall of the trap door.'" (citation omitted)); *see also* Nussbaum, 20 N.C. Cent. Law J. at 122–23 ("in the United States, convicts were hung in town centers so that hundreds (sometimes thousands) of people could watch the ritual that began with the arrival of the condemned person in the custody of the sheriff and ended with the corpse being carted off to an ignominious burial in some potter's field" (internal quotation marks and citation omitted)). Importantly, the Court in *Woodford* rejected California's attempt to narrowly define what qualified as an execution and noted that the public generally had access to the entirety of the execution. 299 F.3d at 876.

The Ninth Circuit in *FACA* found that the historical tradition of public access also "includes the ability to hear the sounds of executions." *See* 938 F.3d at 1075. The Court noted that there were "historical examples in which the public and the press were able to attend hangings with no barriers between the prisoners and witnesses." *Id.* Due to the historically open nature of executions, the Court refused to carve out an exception for a limited aspect of the execution process. *Id.*

### 2. There is a historical tradition of access to the means and methods of an execution

The IDOC asks this Court to limit its historical access analysis to whether there is a historical tradition of access to the Medical Team Room, or rooms like it. Appellant's Br. at 31-32. As the District Court noted, that is far too narrow of an approach and misinterprets the first *Press-Enterprise II* factor as it has been analyzed by the Ninth Circuit because methods of execution have evolved over time. 1-ER-

16; *see also Bucklew v. Precythe*, 587 U.S. 119, 134 (2019) (where the Supreme Court analyzed the progression from one method of execution to another "as soon as an arguably more humane method like lethal injection [became] available"); *Glossip v. Gross*, 576 U.S. 863, 977 (2015) (Sotomayor, J., dissenting) (remarking "lethal injection represents just the latest iteration of the States' centuries-long search for 'neat and non-disfiguring homicidal methods'" (quoting Craig Brandon, *The Electric Chair: An Unnatural American History* 39 (1999)).

Thus, rather than accepting IDOC's invitation to look at a specific method in a specific location, the District Court properly analyzed whether there was a historical right of access to the entire execution, by whatever method or means and in whatever location. 1-ER-16-17. The District Court then properly concluded that there was such historical access. 1-ER-17.

*Woodford*, *Otter*, and *FACA*, support the District Court's conclusion that the historical access to open executions includes the tasks carried out in the Medical Team Room under IDOC's current protocol. As the Ninth Circuit discussed, executions have historically been conducted without barriers to the public and the press. Further, the actual means of execution have historically been open and obvious to the public whether it be rope, sodium cyanide gas, or electricity. *See Guardian News*, 225 F. Supp. 3d at 879 (finding "[t]he public and the press enjoy a qualified First Amendment right of access to view executions in their entirety,

including each administration of the means of achieving death"); *Schad v. Brewer*, No. CV-13-2001-PHX-ROS, 2013 WL 5551668, at *5 (D. Ariz. Oct. 7, 2013). Generally, the public was not limited to viewing only a prisoner's death; they could "see the precise cause and its effects." *Schad*, 2013 WL 5551668, at *5. In other words, the public and the press were historically "allowed to see the specific means used to execute the prisoner." *Id*. Accordingly, being able to view the means and manner of how the IDOC intends to conduct its executions—i.e., the preparation and administration of the lethal injection drugs occurring in the Medical Team Room— falls within the public's historic access to executions.

### 3. The State of Idaho has a history of public access to executions

Idaho's history of executions also shows that the public had a right to see the entire execution, including its means and methods. Indeed, the District of Idaho has already determined that the State of Idaho has a historical tradition of allowing the public to witness the process of putting a condemned inmate to death. *Associated Press v. Otter*, No. 1:12-cv-00255-EJL, 2012 WL 12977323, at *4 (D. Idaho June 5, 2012), *rev'd and remanded*, 682 F.3d 821 (9th Cir. 2012).[5] There, the Court found

---

[5] The district court's decision was reversed and remanded by the Ninth Circuit after concluding that the lower court abused its discretion by finding the media plaintiffs had not met their burden for a preliminary injunction. *See Otter*, 2012 WL 12977323, at *4. However, the district court's evaluation of the historical access to executions in Idaho was not addressed before the Ninth Circuit and is nonetheless instructive.

"the undisputed reality as supported by the newspaper accounts of past executions and the specific language in IDOC's [then applicable] Protocol 135 (which provides for numerous witnesses including the media), is that some portion of the public has historically viewed the execution process in Idaho." *Id*.; *see also* Betsy Z. Russell, *News media witnesses at Idaho executions an Idaho tradition since 1901*, The Spokesman-Review (Jun. 4, 2012), https://www.spokesman.com/stories/2012/jun/04/news-media-witnesses-executions-idaho-tradition/ ("Media witnesses have been present for all but one Idaho execution since 1901 and published detailed accounts of them.").

Additionally, the evidence presented to the District Court confirms that Idaho has a historical tradition of open executions, including the means and methods that effectuate capital punishment. Many executions in Idaho occurred at the Old Idaho State Penitentiary in Boise. When executions were carried out by hanging in the gallows room of Bunk House #5, witnesses were able to see the rope attached to the ceiling and the lever mechanism that the executioner would pull to effectuate an execution. *See* 2-ER-193, ¶ 6; 2-ER-196. Similarly, when hangings were conducted outside, Idaho did not hide any of the fundamental aspects of the execution. 2-ER-193, ¶ 8; 2-ER-198. Again, the executioner was not hidden behind closed doors, and there was no closed room from which the execution team initiated the hanging. Nor was the means of effectuating the execution outside of the public's view. *Id*. Even

other prisoners were able to observe all aspects of the execution. *Id.*

In an attempt to combat Idaho's history of open executions, the IDOC primarily relies on a book by Kathy Deinhardt Hill, *Hanged – A History of Idaho's Executions* (2010) ("*Hanged*"). Appellant's Br. at 36-38, 40, 42. However, almost nothing about that book has been properly placed in the record for this Court's consideration. The IDOC did not raise any of these arguments in its briefing below, nor did it ever place the book itself, or excerpts from it, into the record. *See* 2-ER-212; 3-ER-434-37. Rather, its counsel only briefly referred to it during the hearing, and then only in a limited fashion. 1-ER-15; 3-ER-380-87. However, argument from counsel is not evidence. *United States v. Wilson*, 8 F.4th 970, 974 n.3 (9th Cir. 2021) (finding that factual allegations made by an attorney during oral argument, if unsupported by evidence in the record, do not qualify as evidence). The IDOC also has not provided that book to this Court in an addendum, or otherwise.[6]

The only reference to *Hanged* properly in the record is the District Court's

---

[6] In addition to not placing *Hanged* in the record, almost all of the IDOC's arguments regarding the historical tradition of executions are improperly raised for the first time on appeal. *Smith v. Marsh*, 194 F.3d 1045, 1052 (9th Cir. 1999) ("As a general rule, we will not consider arguments that are raised for the first time on appeal"). The IDOC raised no arguments regarding the historical tradition in its briefing and raised only a limited argument during the hearing. *See* 2-ER-212-13 (only arguing that the Media Group failed to meet its burden); 3-ER-380-387 (largely discussing what the IDOC learned from *Hanged*). The IDOC's arguments regarding the historical tradition of shielding executioners from public view and other jurisdictions' execution practices are improperly raised for the first time on appeal. Appellant's Br. at 33-37, 43-46.

findings from it. The District Court stated that it supported the conclusion that most executions that occurred early in Idaho's statehood were open to the public. *See* 1-ER-15 (citing Kathy Deinhardt Hill, *Hanged – A History of Idaho's Execution* at 26, 35, 93, 235 (2010) (describing the execution of William Henry Hicks "Fred" Bond in 1906, where "a small crowd gathered" to witness the execution; the execution of Fred Seward in 1909, where a crowd of 50 people had gathered, including reporters; the execution of Noah Arnold in 1924 which included a "small group of reporters"; and the execution of Raymond Snowden in 1957, where there was said to be "ten people in the observation room")). Because the only references to *Hanged* in the record before this Court are in the District Court's order, 1-ER-15, and in the IDOC's limited arguments at the hearing, 3-ER-380-387, this Court has no way to independently evaluate the District Court's findings and cannot conclude that they are erroneous. Accordingly, this Court, should it consider *Hanged* at all, should defer to the District Court's findings regarding it, and not rely on the IDOC's new arguments on appeal. *See Brown v. Plata*, 563 U.S. 493, 513 (2011) ("Deference to trial court factfinding reflects an understanding that '[t]he trial judge's major role is the determination of fact, and with experience in fulfilling that role comes expertise.'" (quoting *Anderson v. Bessemer City,* 470 U.S. 564, 574 (1985))).

Simply put, there is a historical tradition of access to executions in their entirety. This includes the means and methods of effectuating that process. This

access is well documented and is supported by the only relevant evidence in the record. The District Court correctly found that the first prong of the *Press-Enterprise II* was satisfied, and this Court should affirm.

### 4. Access to the Medical Team Room, and the tasks performed there, plays a significant role in the functioning of capital punishment

The District Court properly determined that providing public access to the Medical Team Room also satisfies the second prong of the *Press-Enterprise II* test, 1-ER-20-21, which requires a court to determine whether "[i]ndependent public scrutiny—made possible by the public and media witnesses to an execution—plays a significant role in the proper functioning of capital punishment." *Woodford*, 299 F.3d at 876. "To determine whether lethal injection executions are fairly and humanely administered, or whether they ever can be, citizens must have reliable information about" how a state carries out its capital punishment. *Id*. To have reliable information, execution witnesses must "be able to observe and report on the *entire* [execution] process." *FACA*, 938 F.3d at 1076 (emphasis added) (citing *Woodford*, 299 F.3d at 876).

The IDOC contends that access to the condemned person is sufficient to satisfy the public's role in the proper functioning of capital punishment. Appellant's Br. at 47. But that argument misses the mark. Nothing in *Woodford* limited the importance of viewing executions exclusively to the condemned person. Nor does

excluding the public from witnessing some of the most integral aspects of an execution help the public determine whether lethal injection executions in Idaho are fairly and humanely administered. *Woodford*, 299 F.3d at 876. Without access to the Medical Team Room, the press will not be able to inform the public on matters fundamental to the execution process, including the speed, manner, and care with which the lethal injection chemicals are handled, tracked, and administered during the execution. These tasks—the means and manner of lethal injection—are not simply administrative tasks. Rather, if the lethal injection drugs are administered in too heavy of a dose, or in an improper manner, there can be significant ramifications on the pain or distress a condemned person may feel. *See* 2-ER-334, ¶¶ 55-56. Moreover, without public access to the Medical Team Room, it will be impossible for the public to know if the IDOC is even following its own SOP when executing individuals. *See Doe v. Harris*, 772 F.3d 563, 580–81 (9th Cir. 2014) ("[T]he promise from the State that it will use the power appropriately is not sufficient: '[T]he First Amendment protects against the Government; it does not leave us at the mercy of *noblesse oblige*. We would not uphold an unconstitutional statute merely because the Government promised to use it responsibly.'" (citation omitted)); *Spirit of Aloha Temple v. Cnty. of Maui*, 49 F.4th 1180, 1192 (9th Cir. 2022) ("We are not bound by officials' promises that they will enforce the guidelines responsibly."). The press must be able to play its role as the watchdog to ensure no wrongdoing occurs

during executions. *See Salazar*, 677 F.3d at 900 ("When wrongdoing is underway, officials have great incentive to blindfold the watchful eyes of the Fourth Estate.").

There is little doubt that providing access to the Medical Team Room satisfied the second prong of the *Press-Enterprise II* test. The District Court did not err.

## B. The District Court properly determined that the IDOC's restriction of access was not reasonably related to a legitimate penological interest but was an exaggerated response

As the District Court properly found, even if a qualified right of access to the Medical Team Room exists, the IDOC may restrict access if doing so is reasonably related to a legitimate penological interest and does not represent "an exaggerated response to those concerns." 1-ER-21; *see also Woodford*, 299 F.3d at 878 (internal quotation marks omitted) (quoting *Turner*, 482 U.S. at 87). Four factors are relevant when determining if a restriction is a reasonable or an exaggerated response in light of those penological interests: (1) whether there is a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it; (2) whether there are alternative means of exercising the right that remain open to prison inmates; (3) what impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally; and (4) whether there exist ready alternatives that fully accommodate the prisoner's rights at *de minimis* cost to valid penological interests. *Turner*, 482 U.S. at 89-91. If the challenged restriction is not reasonable related to a

legitimate penological interest, i.e., the first factor, courts need not consider the remaining factors. *See Morrison v. Hall*, 261 F.3d 896, 904 (9th Cir. 2001) (holding that if the state cannot show that its restriction is rationally related to a legitimate penological interest under the first *Turner* factor, that is dispositive and the other factors need not be considered).

### i. The District Court correctly determined that the IDOC failed to show there was a legitimate penological interest reasonably related to its restriction on access

The IDOC argues that the District Court erred in finding that the IDOC's restriction of access to the Medical Team Room was not reasonably related to a legitimate penological interest. Appellant's Br. at 54. These arguments fail. The District Court applied the correct standard, and its decision was supported by the evidence (or lack thereof) in the record, Ninth Circuit authority, and common sense. 1-ER-21-30.

### 1. The District Court properly found that the IDOC was required to provide some evidence that its proffered legitimate interests were reasonably related to those concerns

The IDOC first claims that the District Court erred by categorically placing the burden on it to prove that there was a legitimate penological interest supporting its restrictive policy. Appellant's Br. at 53-55. That argument misunderstands the District Court. The District Court correctly explained that the "Ninth Circuit has repeatedly stressed that need for state officials to present evidence supporting their

arguments that public access to aspects of executions will cause problems." 1-ER-23. This is an accurate statement of the law in this Circuit. *See, e.g., Woodford*, 299 F.3d at 882 (emphasizing that the state "must at a minimum supply some evidence that such potential problems are real, not imagined"); *Otter*, 682 F.3d at 825 (noting Idaho officials presented arguments based on "pure speculation" with "no evidence to support" them). In other words, it is insufficient for the IDOC to make a bare assertion that its restriction is reasonably related to a legitimate penological interest; it must put forward some evidence or nonspeculative argument.

Notably, the IDOC does not argue that it actually provided support in the District Court for any of its claimed penological interests, and it does not point to any evidence supporting its claims here. Thus, the District Court, applying the appropriate standard, found that the IDOC failed to provide a basis for its argument that its limit on access to the Medical Team Room was reasonably related to a legitimate penological interest. 1-ER-26 (citing *Turner*, 482 U.S. at 87).

**2. None of the IDOC's proffered interests justify restricting access to the Medical Team Room.**

Even if the IDOC did not need to provide something more than speculation to support its asserted penological interests, and it does, its restrictions on access are not rationally related to the penological interests it asserted in the District Court. In the District Court, the IDOC raised only two penological interests: (1) maintaining the confidentiality of the medical team members' identities to protect their

129695859.1 0012094-00006

anonymity and safety and to allow them to work "in the safest way possible" "without identity-protecting equipment," 2-ER-213-14; 1-ER-21, and (2) providing access would be logistically difficult. 1-ER-25-26. Neither asserted interest supports the IDOC's restriction.[7] Rather, as the District Court ultimately found, they are an exaggerated response to those concerns. 1-ER-26.

The Ninth Circuit has consistently rejected the IDOC's argument that access to a specific aspect of an execution must be denied to protect the identity of the individuals on the medical team, including when the State of Idaho made it before. *See, e.g., Otter*, 682 F.3d at 825; *Woodford*, 299 F.3d at 884–85. The Ninth Circuit has already explained that "an individual wearing a surgical cap, mask and gloves— which, when worn together, cover the forehead, nose, cheeks, mouth and hands— cannot be identified with any meaningful degree of specificity." *Woodford*, 299 F.3d at 884–85. The undisputed evidence in the record confirms that the medical team's attire has sufficiently obscured their identities in past executions. 2-ER-327, ¶ 13.

The IDOC's asserted interest in maintaining the confidentiality of the medical team members' identities is further undermined by IDOC's current SOP, which

---

[7] Despite the IDOC's claims, many of the legitimate interest it now argues support its restriction are raised for the first time on appeal, including preserving the dignity of the process and those involved, protecting Idaho's capital punishment abilities, upholding statutory duties, conserving resources, and protecting the medical team from death threats. 2-ER-213-14; 1-ER-21. To the extent the IDOC now tries to raise new arguments, those should be rejected. *Marsh*, 194 F.3d at 1052.

- 42 -

allows witnesses to see and hear the medical team while they are in the Execution Preparation Room. The Ninth Circuit has already concluded that providing additional access to the medical team did not increase the risk of identifying them. *See, e.g.*, *FACA*, 938 F.3d at 1077 ("Thus, to the extent that execution team members could be identified by the sound of their voices, witnesses can already hear their voices during the initial stages of the execution."). Like in *FACA*, providing access to the Medical Team Room does not create any additional risk not already present by witnesses having access to the Execution Preparation Room. Because the current procedures in place are sufficient to protect the medical team members' identities in the Execution Preparation Room, IDOC's attempt to limit access to the Medical Team Room based on this justification is an exaggerated response.

The IDOC's argument that maintaining anonymity allows the medical team to work "in the safest way possible" fares no better. The IDOC failed to produce any evidence whatsoever that working without identity-protecting equipment is somehow safer than working with it. This unsupported assertion is insufficient to justify infringing on the public's First Amendment right of access. *See Otter*, 682 F.3d at 825 ("This is pure speculation; the State has presented no evidence to support it."). Further, this interest does not comport with common sense. Identity-protecting equipment such as a surgical cap, mask and gloves are commonly used by medical professionals. There is no reason to believe that that equipment somehow hinders

the medical team members' ability to perform their duties in the Medical Team Room.

The IDOC's second asserted penological interest is likewise an exaggerated response to the IDOC's concerns about access to the Medical Team Room. The IDOC claims that the cost of providing a CCTV is somehow insurmountable and justifies infringing on the public's First Amendment right. Appellant's Br. at 63. However, the IDOC has provided no evidence to support its assertion that providing such access would carry a significant "ripple effect" on the prison or the taxpayers. Indeed, under the current SOP, the IDOC already intends to use a closed-circuit audio and video feed to provide access from the Execution Preparation Room to the witness rooms and from the Execution Chamber to the Medical Team Room. Press Release, Idaho Dep't of Corr., *IDOC updates Execution SOP, Protocols* (Oct. 15, 2024). The cost of a CCTV is not so significant to have justified restricting access previously, nor should it be now.[8]

Indeed, that the IDOC has already installed a CCTV for access to some

---

[8] Additionally, F Block is currently under renovation. Press Release, Idaho Dep't of Corr., *F-block retrofit update* (June 2, 2025); *Disabled Rts. Action Comm. v. Las Vegas Events, Inc.*, 375 F.3d 861, 866 n.1 (9th Cir. 2004) (this court may "take judicial notice of the records of state agencies and other undisputed matters of public record"). Thus, the IDOC's refusal to adhere to clear binding precedent should not ultimately provide a lasting justification for restricting the access of the public. Any burden to comply with the First Amendment should fall on the IDOC. *See, e.g., Otter*, 682 F.3d at 822 ("The State of Idaho has had ample opportunity for the past decade to adopt an execution procedure that reflects this settled law.").

portions of an execution suggest that CCTV is a low-cost reasonable alternative that would allow access to the public at a *de minimis* cost.

Even if this Court were to consider the IDOC's newly raised penological interests—it should not—the IDOC's claims still fail. this Court has also rejected the argument that protecting the dignity and sensibility of the condemned person, his family, and other fellow inmates is a legitimate reason to restrict access to some parts of an execution. *Otter*, 682 F.3d at 824. This Court explained that "[i]t strains credulity" to assert that any interest would be "offended to a meaningful[] . . . degree" by allowing witnesses to view the initial procedures when witnesses were already allowed to watch inmates die. *Id*. at 824-25. This logic applies with the same force to the activities that occur in the Medical Team Room where, under the current SOP, the witnesses will have access to the condemned person during the execution process.

Finally, this Court has also rejected an unsupported claim that concern over retaliation is sufficient to justify restricting access. *See Woodford*, 299 F.3d at 882 ("defendants' fear that execution team members will be identified and retaliated against is speculative and contradicted by history"). This concern is further diminished for all the reasons previously discussed regarding protecting team members' identities.

Because the District Court correctly found that IDOC failed to show that the

first *Turner* factor was satisfied, this Court need not address the remaining factors. *See Morrison*, 261 F.3d at 904. Nevertheless, the remaining factors also do not support a different conclusion.

> ### ii. The District Court correctly found that the IDOC's proffered alternative means of exercising the Media Group's right of access is not adequate

The IDOC argues that the second *Turner* factor supports restricting access to the Medical Team Room because, under the current SOP, the medical team's audible notifications of what is occurring in the Medical Team Room are adequate alternative means. Appellant's Br. at 62. The Ninth Circuit disagrees.

The Ninth Circuit has already rejected the argument that the government providing information is an acceptable alternative to access. In *Woodford*, the challenged California procedure eliminated "independent, public eyewitness observation of several crucial steps of the execution process" and forced the public to "rely on the same prison officials who [were] responsible for administering the execution to disclose and provide information about any difficulties with the procedure." 299 F.3d at 883. In finding that a prison official's description of an execution is insufficient to satisfy the First Amendment right of access, the court explained that "[a]n informed public debate is the main purpose for granting a right of access to governmental proceedings. Prison officials simply do not have the same incentives to describe fully the potential shortcomings of lethal injection

executions." *Id*. at 884. The Court further explained that "a prison official's perception of the execution process may be vastly different—and markedly less critical—than that of the public." *Id*.; *see also Harris*, 772 F.3d at 580–81 ("[T]he promise from the State that it will use the power appropriately is not sufficient: '[T]he First Amendment protects against the Government; it does not leave us at the mercy of *noblesse oblige*. We would not uphold an unconstitutional statute merely because the Government promised to use it responsibly.'" (citation omitted)); *Spirit of Aloha Temple*, 49 F.4th at 1192 ("We are not bound by officials' promises that they will enforce the guidelines responsibly.").

The District Court did not err in finding that the IDOC's proffered alternative means are not adequate alternatives to firsthand access to the Medical Team Room. 1-ER-27-28.

### iii. The third and fourth *Turner* factors do not support restricting access

Like the previous factors, the third *Turner* factor—the impact the accommodation would have—and the fourth *Turner* factor—readily available alternatives—do not support the IDOC's position.

Here, the IDOC first tries to recycle its argument that providing audio and visual access would have a negative impact on the State's finances and on taxpayers. This is not the analysis called for by the third *Turner* factor. Rather, as the District Court properly found, the third *Turner* factor addresses the impact that

accommodation would have on guards, other inmates, and allocation of prison resources. 1-ER-28. The visual and audio access ordered here is limited to a specific area of the prison. It would impact few guards or other inmates. And where the IDOC already is renovating the F block where executions occur and has experience with CCTV, the cost should be *de minimis*.

Finally, the District Court found that there is already a low-cost alternative to restricting audio and visual access to the Medical Team Room in order to protect the identities of the medical team members – identity-protecting surgical gear. 1-ER-29.

Accordingly, the District Court did not err in finding that the third and fourth *Turner* factors weigh in the Media Group's favor.

### C. The District Court addressed the PLRA only when it denied the IDOC's motion to dismiss. Thus, IDOC's arguments regarding the PLRA are not properly before this Court.

The IDOC next argues that the District Court's finding that the PLRA is inapplicable was erroneous. Appellant's Br. at 67-68. However, this issue is not properly before this court, nor does it have merit.

### i. The District Court's finding on the PLRA is not properly before this Court.

This issue is not properly before this Court. The District Court did not address the PLRA in its preliminary injunction order. Rather, the District Court rejected the IDOC's PLRA argument when it separately denied the IDOC's motion to dismiss. 1-ER-5; 2-ER-132-34. The IDOC did not appeal that order, however, 3-ER-430-32,

and this Court need not address the IDOC's argument.

### ii. The District Court correctly determined that the PLRA is not applicable.

Even if the IDOC's arguments regarding the PLRA were properly before the Court, the District Court properly held, when denying the IDOC's motion to dismiss, that the PLRA does not govern public access to executions. The District Court found that the PLRA was inapplicable for two reasons. First, the District Court found that the PLRA did not apply because none of the members of the Media Group are prisoners. 2-ER-132-33. Second, the Court found that even if the PLRA did not require the Media Group to be prisoners, the PLRA was still inapplicable because the Media Group's claims do not concern "prison conditions." 2-ER-133-34. The IDOC has not shown that either of the District Court's findings were erroneous.

### 1. The PLRA does not apply because the members of the Media Group are not prisoners.

The IDOC has failed to demonstrate error in the District Court's finding that the PLRA does not apply because the Media Group, and its members, are not prisoners within that act's definition. The District Court reasoned that the IDOC "provid[ed] no support for [its] contention that while the rest of the PLRA seemingly only applies to claims bough by 'prisoners,' this section does not." 2-ER-133. The IDOC once again has failed to provide any authority to support its contention. Indeed, the Ninth Circuit authority addressing the PLRA demonstrates that it

- 49 -

generally only applies in the context of litigation involving prisoners. *See, e.g.*, *Armstrong v. Newsom*, 58 F.4th 1283, 1288 (9th Cir. 2023) (the lawsuit was brought by a class of California prisoners); *Edmo v. Corizon, Inc.*, 935 F.3d 757, 767 (9th Cir. 2019) (involving a transgender prisoner in the custody of the IDOC); *Hallett v. Morgan*, 296 F.3d 732, 738 (9th Cir. 2002) (plaintiffs were a class of prisoners); *Oluwa v. Gomez*, 133 F.3d 1237, 1239 (9th Cir. 1998) (addressing a claim for prospective relief from a prisoner). Because the members of the Media Group are not prisoners, the PLRA does not apply.

### 2. The PLRA does not apply because this lawsuit does not concern prison conditions as defined by the PLRA

As the District Court properly found in its order denying IDOC's motion to dismiss, the PLRA also does not apply for a second reason, this lawsuit does not concern "prison conditions." *See* 2-ER-133-34. By its plain language, section 3626 only applies to civil actions with respect to prison conditions. 18 U.S.C. § 3626(a)(1)(A); *see also Hallett*, 296 F.3d at 742 ("The PLRA limits the power of federal courts to grant or approve certain remedies in actions challenging prison conditions"). The term "civil action with respect to prison conditions," means a proceeding "arising under Federal law with respect to the conditions of confinement or the effects of actions by government officials on the lives of persons confined in prison." 18 U.S.C. § 3626(g)(2).

This lawsuit seeks to vindicate the Media Group's right of access to

executions as surrogates for the public. It does not challenge the conditions of confinement, nor the effects of actions by government officials on the lives of persons confined in prison. *See, e.g., Trueblood v. Washington State Dep't of Soc. & Health Servs.*, No. C14-1178 MJP, 2016 WL 10703626, at \*2 (W.D. Wash. Oct. 13, 2016) ("DRW sought to enforce the due process rights of its class to timely access to the courts, thus this lawsuit is not concerned with the 'conditions' of Plaintiffs' confinement. The PLRA does not apply to Plaintiffs' suit."); *Alabama Disabilities Advoc. Program v. Wood*, 584 F. Supp. 2d 1314, 1316 (M.D. Ala. 2008) ("In the matter at hand, [plaintiff] seeks to enforce its own right of access under federal law and brings no claim concerning the conditions at DYS or the lives of persons confined there."). While an informed discussion may ultimately lead to a policy change, access to the Medical Team Room will not, in and of itself, result in any change to the "conditions of confinement" or the "lives of persons confined in prison."

The IDOC argues that because the District Court's injunction is the "functional equivalent of a stay of execution" it does affect the conditions of confinement. Appellant's Br. at 67. The IDOC, however, complains about a speculative result of its own making. The District Court's order does not prohibit the IDOC from carrying out an execution. The District Court expressly addressed and rejected the IDOC's argument that a preliminary injunction would halt executions.

- 51 -

1-ER-31-32. The relief granted only requires that, if the IDOC decides to conduct an execution, it must comply with the First Amendment by providing public access to the Medical Team Room. Whether it does so is completely within the control of the IDOC. The IDOC does not make any argument that providing access is impossible, unduly burdensome, or time consuming. Indeed, F Block is currently under renovation, providing the IDOC with the opportunity to provide the ordered access. Press Release, Idaho Dep't of Corr., *F-block retrofit update* (June 2, 2025).

Simply put, the IDOC cannot manufacture application of the PLRA by declining to provide the access ordered by the District Court's injunction. The PLRA has no relevance or applicability to this case. The District Court's finding was correct and should be upheld. 2-ER-132-34.

## II. The District Court properly determined that the remaining preliminary injunction factors weigh in favor of a preliminary injunction

The District Court properly determined that the remaining factors weigh in favor of an injunction. First, the loss of First Amendment freedoms, for even minimal periods of time, constitutes irreparable injury. *See, e.g., Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19 (2020) (per curiam) (citation omitted);) *Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*, 82 F.4th 664, 694-95 (9th Cir. 2023) ("Irreparable harm is relatively easy to establish in a First Amendment case because the party seeking the injunction need only demonstrate the existence of a colorable First Amendment claim." (citation

modified)); *Otter*, 682 F.3d at 826 (finding the loss of the right to witness executions in their entirety, even for just one execution, will result in irreparable injury).

Second, where the government opposes the issuance of a preliminary injunction, the final two preliminary injunction factors—the balance of equities and the public interest—merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009). When a plaintiff "raise[s] serious First Amendment questions, that alone compels a finding that the balance of hardships tips sharply in [their] favor." *Fellowship of Christian Athletes*, 82 F.4th at 695 (citation modified). "Courts considering requests for preliminary injunctions have consistently recognized the significant public interest in upholding First Amendment principles." *Otter*, 682 F.3d at 826 (citation omitted).

Here, the District Court properly determined that because the Media Group is likely to succeed on the merits of its First Amendment claim, it also demonstrated that it would be irreparably harmed if it were denied access and that the balance of hardships tipped in its favor. 1-ER-31-32.

## III.    The District Court's injunction is not vague or overly broad

Finally, contrary to the IDOC's argument, Appellant's Br. at 71-73, the injunction is not vague or overbroad.

"Once a constitutional violation is found, a federal court is required to tailor the scope of the remedy to fit the nature and extent of the constitutional violation." *City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1244 (9th Cir. 2018)

(quoting *Hills v. Gautreaux*, 425 U.S. 284, 293–94 (1976)). However, "[a] district court has considerable discretion in fashioning suitable relief and defining the terms of an injunction." *Lamb-Weston, Inc. v. McCain Foods, Ltd.*, 941 F.2d 970, 974 (9th Cir. 1991).

The District Court correctly recognized that the injunctions must be narrowly tailored to the specific harm shown, and it crafted an appropriate remedy. 1-ER-34. The Court held that "[a]t this preliminary stage, the preparation and administration of the legal injection drugs that occurs within the Medical Team Room, is an aspect of the execution that [the Media Group has] demonstrated a right to witness under the First Amendment." *Id*. The Court then when on to say: "To be clear, under the IDOC's current lethal injection execution procedure, the Court's grant of [the Media Group's] injunction requires audio and visual witness access to those medical team members that perform all tasks associated with the preparation and administration of the lethal injection drugs in the Medical Team Room." *Id.*; *see also* 1-ER-28. Despite the IDOC's protests, this injunction is abundantly clear, easily understandable, and narrowly tailored to the constitutional violation.

The IDOC suggests, nonetheless, that the injunction could allow access to such events as trainings or to locations where the lethal injection drugs are stored. This Court should decline the IDOC's invitation to find that access to such events are contemplated by the injunction. The plain language of the injunction cannot be

read to require access to trainings, where there is presumably no "actual" "preparation or administration" of lethal injection drugs occurring in the Medical Team Room. *See* 1-ER-28 ("The Court's grant of Plaintiffs' preliminary injunction . . . allows for limited audio and visual access to the *actual* preparation and administration of the lethal injection drugs in the Medical Team Room." (emphasis added)). Indeed, there is no execution at a training. Nor does the injunction require access to the chemicals when they are "stored in the custody of the Warden." The injunction also does not require the IDOC to open its doors to witnesses any earlier that it already would under the current SOP. Simply put, the IDOC is more than capable of determining what it must do to comply with the District Court's preliminary injunction. Indeed, the IDOC has already revised its execution procedures to comply with constitutional mandates. Appellant's Br. at 20, n.3.

## CONCLUSION

This Court should affirm the District Court in all respects.

DATED: July 18, 2025                    STOEL RIVES LLP


                                        /s/ *Wendy J. Olson*
                                        Wendy J. Olson
                                        Anders Pedersen

129695859.1 0012094-00006

## CERTIFICATE OF COMPLIANCE

9th Circuit Case No.: 25-3312

I am the attorney representing Appellees.

**This brief contains 13,644 words,** including 0 words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief complies with the word limit of Cir. R. 32-1.

July 18, 2025.

/s/ *Wendy J. Olson*
Wendy J. Olson

## CERTIFICATE OF SERVICE

I hereby certify that on July 18, 2025, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals of the Ninth Circuit by using the appellate CM/ECF system.

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

/s/ *Wendy J. Olson*
Wendy J. Olson